**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| USPLY LLC,            ) <br>          ) <br>         Plaintiff,    ) <br>   and           ) <br>            ) <br> VINCENT WOOD JOINT STOCK COMPANY,   ) <br> ET AL.,           ) <br>      Consolidated Plaintiffs,   ) <br>            ) <br>   v.           ) <br>            ) <br> UNITED STATES,       ) <br>            ) <br>        Defendant,    ) <br>   and           ) <br>            ) <br> COALITION FOR FAIR TRADE IN    ) <br> HARDWOOD PLYWOOD,     ) <br>            ) <br>     Defendant-Intervenor.   ) | Consol. Court No. 25-00111 |

**PLAINTIFF USPLY LLC'S AND CONSOLIDATED PLAINTIFF**
**VINCENT WOOD JOINT STOCK COMPANY'S RULE 56.2**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade

("USCIT R."), Plaintiff USPLY LLC and Consolidated Plaintiff Vincent Wood Joint Stock

Company (formally known as Cam Lam Vietnam Joint Stock Company) ("Cam Lam")

(collectively, "IGT Plaintiffs") hereby respectfully move this Court for an order granting

movants judgment on the agency record against Defendant, the United States (representing the

U.S. Department of Commerce ("Commerce")) including but not limited to the following relief:

- Declaring Commerce's application of adverse facts available ("AFA") with

    respect to Cam Lam not supported by substantial evidence or otherwise not in

    accordance with law;

- Declaring Commerce unlawfully relied on 19 U.S.C. § 1677e in applying AFA to Cam Lam based on alleged verification deficiencies related to one employee's absence;

- Declaring Commerce's conclusion concerning Cam Lam's customer purchase order and customer payment information were unsupported by substantial evidence and arbitrary and capricious;

- Declaring that Commerce unlawfully applied materially different verification standards to Cam Lam than the standards Commerce applied to other respondents during the same proceeding without justification;

- Declaring that Commerce's reliance on Cam Lam's post-POR company name change as a basis for applying AFA unsupported by substantial evidence and otherwise contrary to law;

- Remanding this matter to Commerce with instructions to reconsider Cam Lam's reported information without the application of AFA;

- Ordering Commerce to issue a remand redetermination consistent with the Court's opinion; and

- Granting IGT Plaintiffs such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this Motion and the memorandum, IGT Plaintiffs respectfully request that this Court enter judgment in their favor.  A proposed order is attached for the Court's consideration.

Respectfully submitted,

/s/ *Gregory S. Menegaz*

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to USPLY LLC and Vincent Wood Joint Stock Company (formally known as Cam Lam Vietnam Joint Stock Company)*

Dated: May 11, 2026

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| USPLY LLC, | ) |
| Plaintiff, | ) |
| and | ) |
| VINCENT WOOD JOINT STOCK COMPANY, ET AL., | ) Consol. Court No. 25-00111 |
| Consolidated Plaintiffs, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, | ) |
| Defendant-Intervenor. | ) |

### ORDER

Upon consideration of Plaintiff USPLY LLC's and Consolidated Plaintiff Vincent Wood Joint Stock Company's Rule 56.2 Motion for Judgement on the Agency Record, and all other papers and proceedings had herein, it is hereby

**ORDERED** that said Rule 56.2 Motion is GRANTED, and it is further

**ORDERED** that that this case is remanded to the Department of Commerce with instructions that Commerce redetermine aspects of its *Final Results of the Antidumping and Countervailing Duty Administrative Reviews* as instructed by this Court in its accompanying slip opinion.

   **SO ORDERED.**

_____
Mark A. Barnett, Chief Judge

Dated: _____
    New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| USPLY LLC,<br><br>    Plaintiff,<br>  and<br><br>VINCENT WOOD JOINT STOCK COMPANY, ET AL.,<br>    Consolidated Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br>  and<br><br>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,<br><br>    Defendant-Intervenor. | Consol. Court No. 25-00111<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**BUSINESS PROPRIETARY INFORMATION REMOVED IN BRACKETS []** |

### <u>PLAINTIFF USPLY LLC'S AND CONSOLIDATED PLAINTIFF VINCENT WOOD JOINT STOCK COMPANY'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to USPLY LLC and Vincent Wood Joint Stock Company (formally known as Cam Lam Vietnam Joint Stock Company)*

Dated: May 11, 2026

**Non-Confidential Version**

**TABLE OF CONTENTS**

I.      RULE 56.2 STATEMENT ........................................................................... 1

      A.      Administrative Determination Subject to Appeal .................................. 1

      B.      Issues Presented ..................................................................................... 1

II.     STANDARDS OF REVIEW ...................................................................... 2

III.    STATEMENT OF FACTS ......................................................................... 3

IV.    SUMMARY OF ARGUMENT .................................................................. 6

V.      COMMERCE'S APPLICATION OF AFA BASED ON ALLEGED VERIFICATION DEFICIENCIES RELATED TO MR. SUN'S ABSENCE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................................................... 7

      A.      Commerce Verified the Core Question in This Review: Cam Lam Did Not Purchase or Use Chinese Core Materials ............................................... 7

      B.      Commerce's Criticism of Customer A's Purchase Orders Elevates Form Over Substance. .......................................................................................... 14

      C.      Commerce's Payment-Verification Criticism Is Inconsistent with Its Own Verification Practice. .......................................................................... 23

VI.    COMMERCE'S RELIANCE ON CAM LAM'S POST-POR NAME CHANGE DOES NOT SUPPORT ITS AFA APPLICATION UNDER SECTIONS 1677e(a)(2)(A)-(C) ................................................................................... 29

VII.   CONCLUSION AND PRAYER FOR RELIEF ........................................ 33

**Non-Confidential Version**

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006) ..............................3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)............................................2

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)...........................................3

*GreenFirst Forest Prods. Inc. v. United States*, 647 F. Supp. 3d 1352 (Ct. Int'l Trade 2023) .................................................................................................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............... 2-3, 23

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003).........................................8, 8

*Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, 35 CIT 222 (2011)...................................31

*Shandong Yongtai Grp. Co. v. United States*, 415 F. Supp. 3d 1303 (Ct. Int'l Trade 2019)... 32-33

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249 (Ct Int'l Trade 2016) ...........................................................................................................................................2

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................3, 27

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................................2

**Statutes**

19 U.S.C. § 1516a(b)(1)(A). ...........................................................................................................2

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................................................2

19 U.S.C. § 1677e ........................................................................................................................1, 5

19 U.S.C. § 1677e(a)..............................................................................................................6, 7, 29

19 U.S.C. § 1677e(b) .......................................................................................................................7

19 U.S.C. §§ 1677e(a)(2)(A)-(C)..................................................................................2, 5, 30, 31

19 U.S.C. § 1677e(a)(2)(D) ..........................................................................................7, 9, 26, 30

**Non-Confidential Version**

**Administrative Decisions**

*Certain Hardwood Plywood Products From the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46,740 (July 20, 2023) .........................................4

**Non-Confidential Version**

## I.    Rule 56.2 Statement

Pursuant to Rule 56.2(c)(1), Plaintiff USPLY LLC ("USPLY) and Consolidated Plaintiff Vincent Wood Joint Stock Company (formally known as Cam Lam Vietnam Joint Stock Company) (hereinafter, "Cam Lam"), hereby state the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

Plaintiff and Consolidated Plaintiff challenge Commerce's final results in the fifth administrative review of the antidumping order and countervailing duty order of *Hardwood Plywood from China*, including the Final Issues and Decision Memorandum, in which Commerce applied total AFA to Cam Lam based on alleged verification deficiencies and concluded that Cam Lam's data could not be verified. *Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Administrative Reviews of the Antidumping and Countervailing Duty Orders, Final Determination of No Shipments; 2021-2022*, 90 Fed. Reg. 21,271 (May 19, 2025), and accompanying Issues and Decision Memorandum (May 12, 2025) (IDM), **PR 781.**[1] However, this was not a margin review; rather Commerce only investigated whether the origin of the plywood was "Vietnam" or "China". As a result, Commerce treated Cam Lam's products as Chinese hardwood plywood and applied an AFA antidumping duty rate and an AFA countervailing duties, collectively at 190 percent.

---

[1] Citations are denoted by reference to the document numbers assigned in the antidumping public administrative record ("P.R.") and antidumping confidential administrative record ("C.R.") as identified in the indices of the Administrative Records filed by Commerce with the Court on December 19, 2025, ECF Doc. Nos. 34-4, 34-5.

**B.      Issues Presented**

- Whether Commerce's application of facts available and adverse inferences under 19 U.S.C. § 1677e was unsupported by substantial evidence where Commerce successfully verified Cam Lam's accounting systems, sales reporting, raw material purchases, and production tracing methodology.

- Whether Commerce unlawfully concluded that Cam Lam's customer-issued purchase order and payment information could not be verified based on alleged deficiencies concerning customer purchase orders and payment-linkage documentation.

- Whether Commerce acted arbitrarily and capriciously by applying a materially different verification standard to Cam Lam than the standards Commerce applied to other respondents during the same proceeding.

- Whether Commerce unlawfully relied on Cam Lam's post-POR company name change to invoke 19 U.S.C. §§ 1677e(a)(2)(A)-(C).

## II.     Standards of Review

The Court will sustain Commerce's factual determination only if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Moreover, substantial evidence must be evaluated based on the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct Int'l Trade 2016) {internal

2

quotation marks and citation omitted}.

The Court also must hold unlawful any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). Agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is well established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) {alteration, quotation marks, and citation omitted}. Likewise, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). An agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48. As the CIT has recognized, a fundamental principle of administrative law is that, in areas involving "limitless factual variations," "like cases will be treated alike." *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (Ct Int'l Trade 2006) {citation omitted}.

## III.    Statement of Facts

These administrative reviews concern hardwood plywood products from Vietnam covering the period September 26, 2021 through December 31, 2022 ("POR"). *See* IDM at 1. Cam Lam Vietnam Joint Stock Company ("Cam Lam") participated as a respondent in the

3

Non-Confidential Version

reviews. Cam Lam is a producer and exporter of plywood in Vietnam.  In the country-wide scope and circumvention inquiry Commerce conducted from 2020 to 2023, Cam Lam was found to be a company not eligible to certify that its plywood from Vietnam did not fell under the five specific circumvention inquiry production scenarios all involving Chinese core materials (i.e., core veneers, veneer core platforms).  *Certain Hardwood Plywood Products From the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46,740 (July 20, 2023).  Therefore, Cam Lam participated in this review for purposes of demonstrating its suspended entries were of not subject products, and have its certification eligibility on entries going forward re-examined and re-stored.  Commerce conducted this unique and special review accordingly.  All exporters seeking certification eligibility were subjected to questionnaires concerning the origin of raw materials, etc., rather than the standard AD or CVD questionnaires.

Commerce issued Cam Lam a Certification Eligibility Questionnaire ("CEQR") and Supplemental Certification Eligibility Questionnaire ("SCEQR"). In response, Cam Lam timely submitted information concerning its corporate structure, wood-input purchases, production processes, accounting systems, and U.S. sales during the POR. *See generally*, Ltr. from deKieffer & Horgan, PLLC, re: Cam Lam Response to Certification Eligibility Questionnaire (March 21, 2024) ("Cam Lam CEQR"), **PR 578, CR 346-351** (public version of Cam Lam's CEQR was refiled on August 5, 2024); Ltr. from deKieffer & Horgan, PLLC, re: Cam Lam Response to Supplemental Certification Eligibility Questionnaire (Aug. 20, 2024) ("Cam Lam SCEQR"), **PR 607, CR 723-729.** Throughout the proceeding, Cam Lam reported that it did not purchase or use Chinese-origin core veneers or core platforms in the production of plywood exported to the United States during the POR. *See generally*, Cam Lam CEQR and SCEQR.

Non-Confidential Version

Commerce issued preliminary results in these reviews and preliminarily determined that Cam Lam did not export plywood produced under the covered five Chinese-core production scenarios for the POR. *Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2021-2022*, 89 Fed. Reg. 66,346 (August 15, 2024); and *Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2021-2022*, 89 Fed. Reg. 66,343 (August 15, 2024).

Following the preliminary results, Commerce conducted an on-site verification of Cam Lam's questionnaire responses, on September 9 - 11, 2024.  *See* Dep't Commerce, Verification of Cam Lam Vietnam Joint Stock Company's Questionnaire Response at 1 (Nov. 20, 2024) ("Verification Report") **PR 724, CR 1389**. During verification, Commerce examined Cam Lam's accounting systems, wood-input purchases, production tracing methodology, and reported U.S. sales database. *Id.* at 4-14; *see also,* Ltr. from deKieffer & Horgan, PLLC, re: Cam Lam Verification Exhibits (September 18, 2024) ("Verification Exhibit") **PR 669, CR 859-885**. Commerce also reviewed selected sales traces, including supporting sales, production, and payment documentation contained in Verification Exhibits. The verification report stated that Commerce verified Cam Lam's accounting records, material input records, and reported U.S. sales database, but also identified that Cam Lam went through a name change after the POR to Vincent Wood Joint Stock Company ("Vincent"), and Commerce's inability to review certain information due to Mr. Sun's (the Sales Manager) absence. *See* Verification Report at 2-3 & 11-12.

**Non-Confidential Version**

In the final results, Commerce applied total adverse facts available ("AFA") to Cam Lam pursuant to 19 U.S.C. § 1677e. *See* IDM at 55-64. Commerce concluded that certain information could not be fully verified because Mr. Sun was unavailable during verification and because Commerce believed certain purchase-order and payment-linkage information was maintained solely by Mr. Sun. *Id.* at 57-62. Commerce also relied on Cam Lam's post-POR company name change from Cam Lam to Vincent as an additional basis for applying facts available under 19 U.S.C. §§ 1677e(a)(2)(A)-(C). *Id.* at 62-63.

Cam Lam now challenges Commerce's application of AFA in these reviews.

## IV.    Summary of Argument

Commerce's application of total adverse facts available ("AFA") to Cam Lam is unsupported by substantial evidence and otherwise contrary to law because Commerce successfully verified the core factual issue in these reviews: whether Cam Lam purchased or used Chinese-origin core materials in the production of plywood exported to the United States during the POR. During verification, Commerce examined Cam Lam's accounting systems, raw material purchases, production tracing methodology, and reported U.S. sales database, and traced selected sales through production records and back to raw material purchases. Commerce nevertheless applied total AFA based primarily on the absence of one employee during verification and alleged deficiencies concerning certain U.S. customer purchase-order and payment documentation. Under 19 U.S.C. § 1677e(a), however, Commerce may not resort to facts available where the material information necessary to make its determination was successfully verified and is not missing from the record.

Commerce's criticisms of Cam Lam's customer purchase orders and customer payment documentation improperly elevate form over substance and are unsupported by substantial

evidence. Commerce speculated that purportedly "complete purchase orders" existed beyond the purchase-order records maintained by Cam Lam in its normal course of business and reviewed during verification, notwithstanding that the purchase orders contained the material commercial terms that is fully consistent with the final sales documentation. Further, Commerce rejected Cam Lam's customer-payment reconciliation methodology even though Commerce accepted materially similar payment-linkage documentation for other respondents during the same proceeding represented by the same counsel. Commerce therefore applied a materially different verification standard to Cam Lam without reasonably explaining the distinction or why its standard procedures were inadequate. Commerce's application of adverse inferences under 19 U.S.C. § 1677e(b) is independently unsupported by substantial evidence because the record demonstrates that Cam Lam cooperated to the best of its ability throughout the proceeding and verification. Cam Lam submitted the requested questionnaire responses and verification documentation, made senior management and accounting personnel available during verification, and successfully verified its accounting systems, sales reporting, raw material purchases, and production tracing methodology notwithstanding Mr. Sun's absence.

Finally, Commerce's separate reliance on Cam Lam's post-POR company name change does not support the application of facts available because the name change occurred after the POR, was examined at verification, and did not prevent Commerce from evaluating the POR books and records relevant to these reviews.

V.   **Commerce's Application of AFA Based on Alleged Verification Deficiencies Related to Mr. Sun's Absence Is Unsupported by Substantial Evidence.**

A.  **Commerce Verified the Core Question in This Review: Cam Lam Did Not Purchase or Use Chinese Core Materials.**

Commerce applied AFA based on Mr. Sun's absence at verification because Commerce

Non-Confidential Version

concluded that it could not fully verify certain U.S. sales and payment documentation and could not fully examine certain electronic records that Mr. Sun maintained. Specifically, Commerce stated that Mr. Sun's absence prevented Commerce from fully verifying Cam Lam's reported sales and material input purchase information. *See* IDM at 57-58, **PR 781**. Commerce further stated that certain customer purchase orders were maintained in Excel worksheet format and that the actual chat or email related to the purchase order table was only available through Mr. Sun's laptop, such that Commerce was unable to completely query his system or fully understand the scope of the records maintained on his computer. *Id.* at 58-59. Commerce also stated that it could not examine Mr. Sun's payment tracking system that linked customer payments to specific invoices because Mr. Sun was the only person who maintained the payment tracking system. *Id.* at 59-60. Based on these issues, Commerce concluded that Cam Lam provided information that "cannot be verified," thereby warranting the application of facts available under 19 U.S.C. § 1677e(a)(2)(D). *See id.* at 61-62.

Commerce's conclusion ignores the broader verification record and improperly conflates ancillary documentation issues with the core factual issue in these reviews. Under 19 U.S.C. § 1677e(a), Commerce may use facts otherwise available where it has "received less than the full and complete facts needed to make a determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003). Here, however, the verification record demonstrates that Commerce successfully verified the facts needed to resolve the core issue in these reviews: whether Cam Lam purchased or used Chinese core materials during the POR. Commerce may not resort to facts available under 19 U.S.C. § 1677e(a)(2)(D) merely because verification was not conducted in Commerce's preferred manner or because certain supplemental information immaterial to core issue and in one employee's possession was not available during verification.

8

Rather, Commerce must reasonably demonstrate that the reported information itself "cannot be verified" in a manner material to the agency's determination. As discussed below, Commerce successfully verified Cam Lam's accounting systems, raw material purchases, production tracing methodology, sales-trace documentation, and, most importantly, the absence of Chinese core materials used in the production of plywood sold during the POR. The issues identified by Commerce concerning Mr. Sun's absence therefore did not render the reported information unverifiable within the meaning of 19 U.S.C. § 1677e(a)(2)(D).

Indeed, the verification report reflects that Commerce successfully verified Cam Lam's accounting systems, material input reporting, production tracing methodology, and reported U.S. sales data. Commerce verified that Cam Lam's accounting system records purchases of raw materials and tracks payments for raw material purchases. Verification Report at 4, **PR 724, CR 1389**. Commerce reviewed the raw material accounts in Cam Lam's accounting system and "did not observe any purchases of core veneers from Chinese companies reported as suppliers in Cam Lam's questionnaire responses." *Id.* at 5. Commerce further toured the physical space where purchase documentation and invoices were stored and "did not observe any purchases of core veneers or core platforms from China." *Id.* Commerce tied Cam Lam's reported wood-input purchases to its accounting records, which further ties to audited financial statements, and "noted no discrepancies." *Id.* at 8. Commerce also verified that, for wood purchases directly from China, Cam Lam "only purchased face/back veneers," and Commerce examined the underlying commercial invoices, import declarations, warehouse receipts, and accounting data confirming that the Chinese materials purchased were "face/back veneers." *Id.* at 9-10. Commerce further examined Cam Lam's backward tracing methodology from selected U.S. sales back to production of plywood and then back to raw material purchases and confirmed that Cam Lam

9

**Non-Confidential Version**

tracked suppliers and production through purchase-order numbers and warehouse-out slips. *Id*. at 9. Commerce verified, using the sales-trace packages, that there were no discrepancies regarding the core veneers' country of origin as reflected in the sales-trace documentation. *Id*. at 10-12 (Verification Report Section X, verification of the selected sales traces, including tracing the origin of the raw materials used in each package). Notably, in each of the verification exhibits associated with the sales traces, the majority of the exhibits consisted of raw material origin tracing documents. *See, e.g.,* Verification Exhibit VE-9 (starting with the core veneer withdrawal ticket on page 27 through page 62, which is the final page containing Cam Lam's Vietnamese customs import documentation for the imported face and back veneer raw materials), **CR 870-871**; Verification Exhibit VE-10 (where pages 21 through 45 of the 45-page exhibit consist of origin tracing documents for the core veneers and face/back veneers), **CR 872**. While on the sales traces, Commerce noted certain discrepancies and instances where the verifiers examined additional supporting documents for clarification, none of those issues related to the actual tracing of the origin of the raw materials consumed by Cam Lam. *See* Verification Report at 10-12, **CR 1389**. Thus, notwithstanding Commerce's later criticism regarding Mr. Sun's absence, the verification record demonstrates that Commerce successfully verified Cam Lam's reported sales, accounting records, material purchases, and the absence of any Chinese core materials used in production during the POR.

Contrary to Commerce's claim, nothing identified on pages 56-57 of the IDM or the verification agenda explicitly required Mr. Sun's presence at verification. In passing, Commerce claimed that "information at verification to support the reported sales data" was unavailable because Mr. Sun was absent. *See* IDM at 57, **PR 781**. However, Cam Lam's sales database was prepared by Cam Lam's sales staff based on ordinary business records maintained at the

company and submitted in questionnaire responses certified by Cam Lam's majority owner and General Manager, Mr. Ye. Commerce then fully verified the reported sales data, which was itself a stand-alone section of both the verification agenda and verification report. *See* Verification Report at 7-8, Section VI (tying Cam Lam's audited financial statements to sales booked in the accounting system, tying the accounting system to a sales database "that was created using both the system and a manual review of each related sales document," and then tying the overall sales database to the POR sales values reported to Commerce). Notably, Commerce later admitted in the IDM that it "agree{s} with Vietnam Exporter that Commerce verified the Q&V of the sales reported in Cam Lam's U.S. sales database." IDM at 60.

Second, Commerce claimed that Mr. Sun's presence was mandatory because he was the sole person responsible for Cam Lam's raw material ordering process. But while Mr. Sun initiated Cam Lam's raw material purchases, there was no information solely in Mr. Sun's possession regarding the raw materials actually delivered to and paid for by Cam Lam. Cam Lam's actual raw material purchase documentation was maintained at the company and fully verified by Commerce. With respect to Cam Lam's purchases of all core materials, Commerce tied the reported 500-plus purchase transactions for the entire POR, as reported in SCEQR Exhibit SQ1-14, to Cam Lam's accounting records. *See* Verification Report at 8, **PR 724, CR 1389** ("We tied the filtered database {from Cam Lam's various accounting ledgers} to Cam Lam's list of wood input purchases at Exhibit SQ1-14 of Cam Lam's SECQR…..and noted no discrepancies," citing Verification Exhibit VE-6 (**CR 866-867**)). Commerce also sampled the underlying origin packages through which Cam Lam demonstrated how it traced purchased core veneers back to wood logs harvested in Vietnam and to the farmers' plantation parcels in Vietnam. *See* Verification Report at 9 (explaining that, in performing the procedure of

11

demonstrating that each sale in Attachment III "were not of products produced under one of the five production scenarios," the verifiers conducted the procedure in the context of the "pre-selected and surprise sales trace packages" and "our examination of the production process, products the meet the description of the scope, and throughout our review of the raw material purchase data."). In Commerce's "completeness test," three of the five completeness-test components related to raw material purchases, and Commerce verified those components without finding discrepancies. *Id.* at 13-14 (describing the documents requested and verified in Completeness Tests #1, #2, and #5).

Had Mr. Sun been present, the additional information Commerce could have sought from him—beyond the documents Commerce already fully verified—would have only possibly concerned internal business considerations underlying the purchasing process, such as when Cam Lam decided to replenish inventory levels, which suppliers Mr. Sun contacted first regarding raw material availability, how Cam Lam decided to allocate purchasing volume among different suppliers, etc. But such information was not necessary to Commerce's determination. Commerce itself defined the scope of necessary information by requesting the actual material input purchases Cam Lam made during the POR, not internal business rationales underlying those purchases. *See* Cam Lam CEQR at 19-22 (Mar. 21, 2024) (asking several questions relates to wood inputs that are either related to inventory movement of wood input or purchase of wood input, which necessarily relates to inputs that Cam Lam actually purchased – and received – and paid for), **PR 578, CR 346-351**; Cam Lam SCEQR at 12-14 (Aug. 20, 2024) (all input purchases questions either are targeted for material input used to produce hardwood plywood sold to the U.S. or Cam Lam's previously reported overall material input purchases), **PR 607, CR 723-729**. Indeed, in the two rounds of questionnaires issued to Cam Lam prior to verification, Commerce

12

Non-Confidential Version

did not request information concerning the internal decision-making process behind Cam Lam's raw material purchasing decisions, only the actual input purchases and input consumption for plywood sold to the U.S. Cam Lam fully responded to the information Commerce requested, and Commerce fully verified Cam Lam's reported material input purchases.

The fundamental question in these reviews is whether Cam Lam produced or sold plywood falling within any of the five production scenarios involving Chinese core materials. Thus, Commerce was not limited to verifying the origin of core materials solely through backward tracing from the eight selected sales traces. Rather, Cam Lam reported all wood-input purchases made during the POR, regardless of whether the purchased materials were ultimately used in plywood sold domestically, sold to third-country markets, or sold to the United States. Commerce then verified that broader universe of purchases through Cam Lam's accounting records, raw material purchase databases, warehouse documentation, and supporting source documents. *See* Verification Report at 4-5, 8-10, **PR 724, CR 1389**. Commerce specifically verified that Cam Lam did not purchase Chinese core veneers or core platforms during the POR and further verified that the only Chinese-origin materials purchased by Cam Lam were face and back veneers that were recorded and consumed as face and back veneers. *Id.* Accordingly, substantial evidence on the record independently establishes that Cam Lam did not purchase or consume Chinese core materials during the POR, irrespective of any alleged issues regarding the format or completeness of certain customer purchase orders or payment tracking note.

Against this backdrop, Commerce's remaining concerns regarding certain purchase-order formats and payment-linkage information did not render the reported information unverifiable and do not support Commerce's resort to AFA, as discussed below.

13

### B. Commerce's Criticism of Customer A's Purchase Orders Elevates Form Over Substance

Commerce's application of AFA also rests on Commerce's characterization of certain purchase orders associated with one customer, [          ] ("Customer A"), as "manipulated versions" and Commerce's related assumption that Cam Lam failed to provide purportedly "complete" purchase orders that Commerce believed existed elsewhere. *See* IDM at 58-60, **PR 781**. But Commerce's conclusions are unsupported by the record and stem from a fundamental misunderstanding of both the format in which Customer A ordinarily transmitted purchase orders and the role those purchase orders served in Commerce's sales-trace verification procedures. The verification record demonstrates that the purchase orders maintained by Cam Lam contained all material commercial terms necessary for the verification of the selected sales traces and that Commerce successfully verified the linkage between the U.S. sales, production records, and raw material tracing documentation notwithstanding Mr. Sun's absence.

First, Commerce incorrectly characterized the customer purchase orders maintained by Cam Lam as "manipulated versions." *See* IDM at 58.  The verification report itself did not describe the purchase orders as "manipulated." Rather, the verification report stated only that the purchase order "was only a worksheet comprised of several rows and columns, without any other information." Verification Report at 11, **PR 724, CR 1389**. Importantly, even that characterization from the verification report is misleading. While Customer A's purchase orders were maintained in Excel spreadsheet format, the documents nonetheless contained all substantive information ordinarily associated with commercial purchase orders. Specifically, the purchase orders included columns for "Date," "PO No.," "Item No.," "Size," "W," "L," "Grade," "Mark," "Description," "Crate," "Pcs/Crate," "Total Pcs," "CBM," "Price USD/M3," "Price USD/PC," "Total," "Ship-Date," "Description," "Container Size," "Delivery Term," and

14

**Non-Confidential Version**

"Payment Term." *See e.g.,* Verification Exhibit VE-12 at 3, **CR 874-875**. The spreadsheets therefore identified the ordered products, quantities, dimensions, pricing, shipment timing, container specifications, and payment and delivery terms—i.e., the core transactional information that defines a purchase order.

Indeed, when compared side-by-side with the purchase order issued by another customer, [                    ] ("Customer B"), Commerce's criticism elevates form over substance. *Compare* Verification Exhibit VE-12 at 3 (Customer A purchase order), **CR 874-875**, *with* Verification Exhibit VE-13 at 2 (Customer B purchase order), **CR 876**. Customer B's purchase order appeared more formal because it was arranged in a printer-friendly template and displayed the parties' names and addresses in a conventional purchase-order layout. But there is no material ordering information reflected on Customer B's purchase order that was absent from Customer A's purchase order. Both documents conveyed the same fundamental commercial details: the ordered merchandise, product specifications, quantities, prices, shipment timing, and applicable commercial terms. Purchase order received is not an accounting document and does not enter an exporter's accounting records; even CBP does not require U.S. importers to maintain the purchase orders they issued to their foreign vendors in the list of required documents supporting entry declaration to retain for 5 years.

Nor was there anything unusual or suspicious about Customer A issuing purchase orders in Excel spreadsheet format. Customer A was a long-term customer, and Cam Lam had no reason to control the format in which Customer A chose to issue its purchase orders. Cam Lam simply maintained the purchase orders in the same format in which Customer A transmitted them and included those purchase orders in the sales trace packages presented to Commerce during verification. Moreover, record evidence demonstrates that Customer A routinely issued

**Non-Confidential Version**

substantially similar purchase orders to other Vietnamese exporters. For example, Customer A issued an almost identical purchase order to another respondent verified by Commerce, [

], and Commerce raised no concerns regarding that purchase order during the [          ] verification. *See* [


].

Likewise, the record contains additional purchase orders Customer A issued to [

], which contained the same substantive product and sales information reflected on the purchase orders maintained by Cam Lam. *See* [



]. Although Customer A's purchase orders issued to [       ] appeared more formal because they included Customer A's logo, letterhead, and full company addresses of the two parties, the underlying transactional template and substantive ordering information provided remained the same.

These record examples confirm that Customer A consistently used the same underlying purchase-order structure and did not include additional information—such as species or intended end-use specifications—that Commerce speculated would ordinarily appear on "complete" purchase orders. *See* IDM at 60 (Commerce erroneously suggesting Customer A's purchase orders Cam Lam maintained were incomplete because customer purchase orders generally will "provide more detail regarding the sale, such as the species or intended end-use of the product that they ordered."). In fact, most U.S. importer's purchase order documentation would not contain such information other than the face veneer species that is normally incorporated into the

16

product description, yet this review is not about the face veneers.  Commerce's assumption that the purchase orders maintained by Cam Lam were somehow unreliable or "manipulated" is therefore wholly unsupported by substantial evidence.

Second, Commerce's assumption that there existed a separate set of "complete purchase orders" that Cam Lam failed to provide is unsupported by the record and appears to stem from a misunderstanding of both the verification testimony and the manner in which Customer A transmitted purchase orders to Cam Lam. *See* IDM at 58-60, **PR 781**; Verification Report at 11, **PR 724, CR 1389**. The verification report explained only that Customer A's purchase orders were generally sent to Mr. Sun through WeChat or email and that "the actual chat or email related to the purchase order table" was only available through Mr. Sun's laptop. Verification Report at 11. But the WeChat messages or emails transmitting the purchase orders were not themselves separate "complete purchase orders." Rather, the Excel spreadsheet attachments themselves were the purchase orders. When Customer A transmitted the excel spreadsheet purchase order through WeChat or email, Mr. Sun downloaded the Excel attachment, saved the file to Cam Lam's records, and Cam Lam staff then printed and maintained the purchase order together with the corresponding sales documentation, including the commercial invoice, packing list, and bill of lading. *Id.*; *see generally,* Verification Exhibit VE-12 at 3, **CR 874-875**; Verification Exhibit VE-14 at 3, **CR 877**. In this final step, when staff printed the purchase order for the purpose of keeping *physical* copies, staff sometimes copied and pasted from Customer A's spreadsheet template only the purchase orders relevant to the particular shipment reflected in the corresponding sales package. For example, in the sale reflected in Verification Exhibit VE-14, Customer A's Excel spreadsheet contained seven different purchase orders, but Cam Lam staff copied and pasted only the two purchase orders associated with the commercial invoice in

17

that package—[                                        ]—and maintained the purchase order

excel with only those two purchase order numbers together with Commercial Invoice

[            ]. *See* Verification Exhibit VE-14 at 3-5. The two purchase orders reflected in

Verification Exhibit VE-14 on page 3 and on page 4 were therefore both complete and actual

purchase orders maintained by Cam Lam in the ordinary course of business.

Commerce's misunderstanding appears to have arisen from the fact that the underlying

WeChat messages or emails transmitting the Excel purchase orders were generally not separately

maintained after the purchase-order attachment itself was downloaded and saved. *See*

Verification Report at 11. Commerce later transformed that explanation into the incorrect

assertion that "complete purchase orders" were maintained separately on Mr. Sun's laptop. *See*

IDM at 58. However, there is nothing unusual about Cam Lam's recordkeeping practice. In

modern commercial transactions, overseas customers ordinarily transmit purchase orders

electronically through email or instant messaging applications rather than through mail or fax.

The relevant commercial document is the purchase-order attachment itself, not the brief

transmittal message accompanying the attachment. Indeed, for the Customer A purchase orders

included in the pre-selected and surprise sales traces, Mr. Sun nevertheless produced screenshots

of the WeChat correspondence transmitting the purchase orders when Commerce requested

them. *See* Verification Exhibits VE-9 at 2 (**CR 870-871**), VE-12 at 2 (**CR 874-875**), VE-14 at 2

(**CR 877**), and VE-16 at 2 (**CR 880**). Those communications consisted only of brief transmittal

messages such as "please receive it" or "please stay on top of production to ensure timely

delivery," confirming that the WeChat messages themselves contained no substantive ordering

information beyond transmitting the Excel spreadsheet purchase-order attachment. Nothing in

those screenshots suggests the existence of additional "complete purchase orders" separate from

18

**Non-Confidential Version**

the Excel purchase orders already maintained by Cam Lam and presented to Commerce during verification.

Moreover, the record demonstrates that Cam Lam maintained Customer A's purchase orders in its ordinary course of business together with the remainder of the sales documentation associated with each transaction. Commerce acknowledged that, during the facility tour, the verifiers observed "import documentation and purchase invoices" maintained in the "sales office". Verification Report at 5. Commerce nevertheless suggested in the IDM that the verifiers did not observe customer purchase orders in the sales office because the verification report specifically referenced only "import documentation and purchase invoices." *See* IDM at 58. But the fact that the verification report expressly identified certain categories of documents does not mean those were the only records maintained or made available during verification. During the sales office tour—which involved a relatively small office area—counsel specifically explained to the verifiers that the filing cabinets in a portion of the sales office contained Cam Lam's sales documentation and that those records were fully available for Commerce's review. The Customer A purchase orders themselves were also repeatedly reviewed by Commerce during the sales-trace portion of verification and were placed on the record as verification exhibits. See Verification Exhibits VE-9, VE-12, VE-14, and VE-16. Indeed, if the verifiers had actually observed that Cam Lam's **<u>sales</u>** office contained only material input purchase documentations but **<u>no sales documentation whatsoever</u>**, one would reasonably expect the verification report to specifically identify that circumstance and inquire where the sales documentation was maintained instead. The verification report contains no such statement. Thus, the record does not support Commerce's suggestion that Cam Lam failed to maintain or provide the purchase orders

19

Non-Confidential Version

associated with the underlying transactions, or that Cam Lam somehow did not made those documents available during verification.

In sum, the record demonstrates that Cam Lam preserved Customer A's purchase orders in the same format in which Customer A transmitted them, maintained physical copies of the relevant purchase orders in the ordinary course of business, and provided those purchase orders to Commerce as part of the sales-trace packages reviewed at verification. The only information not maintained were the brief electronic transmittal messages accompanying the purchase-order documents, and even those messages were nevertheless produced to Commerce upon request during verification. Commerce's conclusion that Cam Lam failed to provide purportedly "complete purchase orders" is therefore unsupported by substantial evidence.

Fundamentally, the purchase-order number—not the stylistic format of the purchase order itself—is the key identifier used in tracing the selected U.S. sales through production and back to the underlying raw material purchases. Commerce selected the sales traces based on the sequence numbers in Cam Lam's reported U.S. sales database, and Commerce verified Cam Lam's reported U.S. sales as complete and accurate. *See* Verification Report at 7-8.

During the sales-trace portion of verification, Commerce reviewed the purchase orders only in the context of tracing the selected sales packages and linking the sale to the corresponding production and raw material documentation. *See generally* Verification Exhibits VE-9 through VE-16, **CR 870-880**. For that purpose, Commerce confirmed that the purchase-order number, product description, quantity, and pricing information reflected on the purchase order documents corresponded to the commercial invoice, packing list and bill of lading for the selected sale. *Id.* Commerce successfully performed that verification and identified no discrepancies undermining the tracing of the selected sales through production and raw material

20

consumption. *Id*. Thus, the sales traces accomplished their intended purpose: tracing the country of origin of the core materials consumed in the production of the selected plywood sales.

Even assuming arguendo—which is not the case here—that the physical copies of Customer A's purchase orders maintained by Cam Lam did not reflect every item initially discussed or contemplated between Customer A and Cam Lam, that circumstance would not undermine Commerce's tracing analysis. At most, it would mean that certain products originally contemplated in Customer A's purchase order excel spreadsheet were cancelled and therefore never appeared on the commercial invoice, production records, or export documentation associated with the actual POR sale. Such hypothetical additional products would be irrelevant to the verification of the selected sales traces because Commerce's tracing analysis concerned the products actually sold, produced, and exported during the POR. Commerce therefore cannot reasonably apply AFA based on speculative assumptions regarding purportedly "complete" purchase orders where any allegedly missing information would have no bearing on the origin or nature of the plywood actually sold to the United States or Commerce's chosen sales trace sample methodology.

Indeed, Commerce itself explained in the Final IDM that the customer purchase-order numbers were used for "tracking the raw materials through production" and linking "the sale and production documentation." *See* IDM at 60. But that explanation undermines, rather than supports, Commerce's AFA determination. Cam Lam's commercial invoices identify the **purchase-order number** associated with each product line item together with the corresponding product description, quantity, and price. *See generally* Verification Exhibits VE-9 through VE-16, **CR 870-880**. In each of the eight sales-trace packages reviewed by Commerce—including the four packages involving Customer A—the purchase-order number, product description,

21

Non-Confidential Version

quantity, and pricing information reflected on the commercial invoice are consistent with the corresponding information reflected on the purchase orders maintained by Cam Lam in the sales packages. Commerce is therefore correct that the purchase-order number serves as the linkage between the U.S. sale and Cam Lam's production documentation. But Commerce unjustifiably ignored the fact that the purchase-order number itself was already reflected directly on the final commercial sales documentation reviewed and verified by Commerce. And the commercial invoice is an accounting record that is recorded in sales ledgers and vouchers and eventually traces up to the Income Statement in the financial records and statements.

That point is particularly significant because Commerce's questionnaires required respondents to report U.S. sales based on sales and invoice documentation, not based on purchase-order documentation. Commerce thus recognized throughout the proceeding that the commercial invoice associated with the shipment is the operative commercial sales document reflecting the final products actually sold and exported to the United States. Consequently, where the purchase-order number reflected on the commercial invoice matched the purchase-order number reflected on the purchase orders maintained by Cam Lam, and where the products reflected on the invoice matched the products reflected on the purchase orders included in the sales packages, any hypothetical additional items that may have appeared elsewhere in Customer A's broader spreadsheet template would not undermine the tracing of the raw material inputs associated with the actual POR sale reviewed by Commerce. Commerce therefore cannot reasonably conclude that the sales traces were unverifiable merely because it speculated that broader spreadsheet templates may have existed beyond the purchase orders actually associated with the reviewed sales transactions.

22

**Non-Confidential Version**

Under the arbitrary-and-capricious standard, an agency acts unlawfully where it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, Commerce's AFA determination improperly elevates the format in which Customer A transmitted its purchase orders over the substance of the verified sales, production, and raw material tracing information on the record. Commerce verified the linkage between the sales documentation, production records, and raw material tracing documentation, yet nevertheless concluded that Cam Lam's sales were somehow unverifiable based on speculative assumptions regarding purportedly "complete" purchase orders that the record contains no evidence to have existed. Commerce's determination therefore is arbitrary and capricious in addition to falling short as unsupported by substantial evidence.

### C.  Commerce's Payment-Verification Criticism Is Inconsistent with Its Own Verification Practice.

Next, Commerce claimed that it was unable to verify the U.S. customer payments because the wire transactions themselves did not specifically identify the invoices covered by the payments. *See* IDM at 59-60. There is no evidence on this record or in the review overall that wire transfers must include invoice numbers.  Wires do include the sender and receiver information and the dollar amount and accounting staff can track, link and reconcile payments that came in with open balances.  Moreover, Commerce's characterization in the Final IDM materially overstates the actual issue identified at verification.

As an initial matter, the verification report did not state that the underlying bank statements or payment records were unavailable. Rather, the verification report explained only that Commerce was unable to fully understand Mr. Sun's internal methodology for tracking which customer

payments corresponded to particular invoices. *See* Verification Report at 12, **PR 724, CR 1389**.

Cam Lam had all relevant bank statements available during verification and submitted the

relevant bank-statement excerpts in Verification Exhibits VE-9 through VE-16, which

Commerce reviewed and placed on the record as part of the verification exhibits. *See, e.g.,*

Verification Exhibit VE-9 at 7 (matching the sum of three payments to the sum of sixteen

invoices on a reconciliation chart) and 8-10 (bank statement excerpts with the relevant payment

line items circled), **CR 870-871**; Verification Exhibit VE-10 at 4 (matching one payment to one

invoice less the bank charge) and 5 (corresponding bank statement excerpt), **CR 872**. Thus,

notwithstanding Mr. Sun's absence, the underlying bank records and accounting records

reflecting customer payments were fully available to Commerce during verification, fully

explained and justified payments for sampled invoices, and were maintained by Cam Lam's

accounting department. Contrary to Commerce's characterization, the only information that may

not have been available was Mr. Sun's informal notes identifying which payments corresponded

to which invoices before the payments were formally recorded into Cam Lam's accounting

system. But once the payments were recorded into Cam Lam's accounting ledgers and

accounting system, there would have been little reason to separately preserve such informal

notes. In any event, Cam Lam did not require those notes to tie payments to sales transactions.

Cam Lam is a relatively small company with a limited number of customers and transactions,

and the customer-payment information was fully recorded and maintained through the

company's accounting department.

Critically, Commerce has consistently accepted proof of payment through the same type of

reconciliation methodology used by Cam Lam here. Specifically, Commerce routinely accepts

bank statements together with payment breakdown charts tying one or multiple customer

**Non-Confidential Version**

payments to one or multiple invoices, even where the underlying wire transfers themselves do not identify the invoice numbers covered by the payments or do not match the invoiced amounts one-for-one. In the verifications of at least three other respondents, Commerce accepted the same type of payment breakdown charts linking customer payments to invoices that included selected sales traces, together with applicable adjustments, and made no comments on those payment breakdown charts or slips in the corresponding verification reports. *See* [

];  [

];  [

].

25

**Non-Confidential Version**

These examples reflect Commerce's established verification practice of accepting proof of payment where the respondent provides bank statements together with a reconciliation chart or similar supporting documentation tying the payments to the relevant invoices. After all, respondents cannot control whether their customers include invoice-specific references in wire-transfer notations. Here, Commerce failed to provide any reasonable explanation for departing from its normal verification practice and instead requiring more than the payment reconciliation charts and bank statements provided by Cam Lam.

Commerce's criticism is particularly unreasonable because Commerce never identified any discrepancy suggesting that the customer payments reflected in Cam Lam's accounting records were inaccurate, fabricated, or unrelated to the underlying sales transactions. Nor did Commerce identify any discrepancy between the amounts reflected in the bank statements, the accounting records, and the associated invoice reconciliation charts. Rather, Commerce's criticism rests solely on the fact that the customer wire transfers themselves did not specifically identify invoice numbers and that Commerce was unable to review any additional informal notes Mr. Sun may have maintained before the payment information was formally entered into Cam Lam's accounting system.

Commerce has never explained why such informal notes were necessary where the underlying payment information itself was fully recorded in Cam Lam's accounting records and where the payment reconciliation methodology matched the same methodology Commerce accepted for other respondents during the same proceeding and in some 40 years of verifying other exporters' sales. Commerce therefore cannot reasonably conclude, on this record, that the customer-payment information "cannot be verified" within the meaning of 19 U.S.C. § 1677e(a)(2)(D).

Commerce also failed to reasonably explain why the same type of payment reconciliation methodology it accepted for other respondents suddenly became insufficient in Cam Lam's verification merely because Mr. Sun was unavailable during verification. "{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001){internal citation omitted}. Here, Commerce accepted materially similar payment reconciliation charts and bank statements for other respondents during the same proceeding even where the underlying wire transfers themselves did not identify the specific invoices covered by the payments. Yet Commerce applied a materially different verification records standard to Cam Lam without explaining why Cam Lam's payment documentation was insufficient while substantially similar documentation from other respondents was accepted. Commerce's determination therefore reflects an unexplained and unreasonable departure from its verification practice.

In conclusion, Commerce was able to verify all material information related to Cam Lam's input purchases, customer purchase orders, sales reporting, and customer payment information notwithstanding Mr. Sun's absence. Under these circumstances, the record also does not support Commerce's conclusion that Cam Lam failed to cooperate "to the best of its ability" within the meaning of 19 U.S.C. § 1677e(b). Cam Lam made senior management and accounting personnel available throughout verification, including Mr. Ye, Cam Lam's majority shareholder and General Manager, who supervised overall company operations, including sales, and certified Cam Lam's questionnaire responses. Cam Lam CEQR; Cam Lam SCEQR.  The record further demonstrates that Mr. Ye—not Mr. Sun—made the ultimate operational and sales decisions on behalf of Cam Lam. *See, e.g.*, Verification Exhibit VE-9 at 2 (Customer A asking Mr. Sun to remind factory director to stay on top of the production schedule) (**CR 870-871**); VE-14 at 2

27

**Non-Confidential Version**

(Customer A sending the PO and stating "{a}bove is what I have confirmed with Mr. Ye over the weekend") (**CR 877**); VE-16 at 2 (Mr. Sun asking Customer A that "Mr. Ye wants to know" if Cam Lam can use a different grade of face veneer due to insufficient inventory) (**CR 880**). Thus, while Mr. Sun, the Sales Manager of a small company, assisted with day-to-day sales administration including receiving purchase orders, preparing shipping documentation, and assisting accounting personnel in tracking payment status, the record demonstrates that Mr. Ye remained the primary decision-maker overseeing Cam Lam's production and sales operations and the primary official responsible for Cam Lam's questionnaire responses during the proceeding. Commerce's verification agenda required the attendance of "company officials who actually prepared the company response," and Cam Lam complied with that requirement. *See* Dep't Commerce, Cam Lam Verification Agenda (Aug. 30, 2024) at 2-4, **PR 629, CR 768**. Moreover, the Federal Circuit has explained that "compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). At the same time, the statute "does not condone inattentiveness, carelessness, or inadequate record keeping," but neither does it require "perfection and absolute accuracy." *Id.* Here, the record demonstrates that Cam Lam put forth its maximum effort to cooperate with Commerce's verification notwithstanding Mr. Sun's unavailability. Cam Lam made its accounting personnel and senior management available throughout verification, provided the underlying accounting records, payment records, sales-trace documentation, raw material purchase documentation, and production tracing documentation requested by Commerce, and even produced screenshots of the WeChat communications Commerce requested during verification. *See* VE-9 at 2; VE-12 at 2; VE-14 at

28

**Non-Confidential Version**

2; VE-16 at 2, **CR 870-871, CR 874-875, CR 877, CR 880**. Most importantly, Commerce successfully verified Cam Lam's accounting systems, reported sales database, raw material purchases, production tracing methodology, and the absence of Chinese core materials used during the POR. Under these circumstances, the record does not support a finding that Cam Lam failed to cooperate to the best of its ability merely because one employee was unavailable during verification.

In sum, Commerce verified the core issue in these reviews: Cam Lam did not purchase or use Chinese core materials in the production of plywood during the POR—globally and for individual sales traces. The remaining issues identified by Commerce concerned ancillary documentation issues and Commerce's inability to review certain supplemental information allegedly maintained by Mr. Sun, notwithstanding the fact that Commerce successfully verified all aspects of Cam Lam's operations that is material to the core issue, i.e., that Cam Lam did not produce or export plywood to the U.S. that were produced under the 5 circumvention production scenarios. Because Commerce's stated concerns neither rendered the reported information unverifiable within the meaning of 19 U.S.C. § 1677e(a) nor demonstrated that Cam Lam failed to cooperate to the best of its ability under 19 U.S.C. § 1677e(b), Commerce's resort to facts available and adverse inferences is unsupported by substantial evidence and contrary to law.

**VI.    Commerce's reliance on Cam Lam's post-POR name change does not support its AFA application under sections 1677e(a)(2)(A) – (C).**

Commerce separately relied on Cam Lam's post-POR name change from Cam Lam to Vincent to find that facts available was warranted. Specifically, Commerce stated that Cam Lam "repeatedly referred to itself as an active and existing company," that Cam Lam provided a company history only through two months before the name change, and that Cam Lam therefore

29

Non-Confidential Version

"withheld this crucial information, failed to report the information in the form and manner requested, and significantly impeded these reviews by failing to provide the necessary information for Commerce to determine whether such a successor-in-interest analysis was warranted." IDM at 62-63. On that basis, Commerce invoked 19 U.S.C. §§ 1677e(a)(2)(A)-(C) to apply AFA. *Id.* This conclusion is unsupported by substantial evidence because Commerce did not identify any information missing from the record that was necessary to determine whether Cam Lam's POR entries were subject merchandise or whether Cam Lam could establish certification eligibility based on its POR books and records.

The record shows that Cam Lam changed its name in December 2023, approximately twelve months <u>after</u> the end of the POR. *See* VE-2 at 12-13. As explained at verification, "with the change to the name, they stopped exporting all together, and currently only focus on domestic sales." Verification Report at 3, **PR 724, CR 1389**. Thus, all POR production, sales, and exports at issue were made under the Cam Lam name. Importantly, Commerce did not invoke section 1677e(a)(2)(D) or find that Cam Lam's reported POR corporate history information "cannot be verified." Instead, Commerce stated that the alleged issue was whether a successor-in-interest analysis "was warranted." IDM at 63. But the record demonstrates that Commerce was fully capable of evaluating that issue at verification. Specifically, Commerce reviewed the updated business license, which showed the same business registration number, same company address, same registered capital, and same shareholder information, with only the company name changed in December 2023. Thus, Commerce possessed the very information it claimed had been withheld and was able to assess whether any substantive corporate change had occurred. Indeed, Commerce identified no operational, ownership, production, or management changes whatsoever beyond the company name itself. Under these circumstances, Commerce

30

cannot reasonably claim that the omission "significantly impeded" the proceeding within the meaning of section 1677e(a)(2)(C) because Commerce was able to conduct the precise analysis it claimed the omission supposedly prevented. Nor can Commerce reasonably characterize the omission as withholding information under section 1677e(a)(2)(A) where the information was disclosed and fully examined at verification and where all POR production, sales, and exports at issue were made under the Cam Lam name. At most, the record reflects a disagreement regarding whether a post-POR name change fell within the scope of Commerce's requests, not the type of material withholding or obstruction contemplated by sections 1677e(a)(2)(A)-(C). POR questionnaires by practice necessarily implicate that respondents should not respond to an unlimited universe of information but rather to the information pertinent to the POR itself.

Commerce's reliance on successor-in-interest principles only underscores the immateriality of the issue. Successor-in-interest analysis is used to decide whether a new or changed company may inherit the cash-deposit treatment assigned to another company. The CIT has recognized Commerce's practice that, where the successor is not essentially the same as the predecessor, Commerce "should normally assign the successor company the 'all others' rate until an administrative review is requested." *GreenFirst Forest Prods. Inc. v. United States*, 647 F. Supp. 3d 1352, 1355 (Ct. Int'l Trade 2023). The *GreenFirst* case involved a party's challenge to whether Commerce reasonably declined to fully perform a successor-in-interest analysis where the record reflected evidence of significant corporate changes. Similarly, in *Marsan*, the CIT explained that a changed company could not "automatically" succeed to the prior company's rate without Commerce first determining that it was "essentially the same entity." *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, 35 CIT 222, 233-34 (2011). But Cam Lam was not asking Commerce to assign Vincent a predecessor's rate during the POR. Cam Lam was the

31

Non-Confidential Version

entity under review throughout the POR, Cam Lam was the entity previously found ineligible to certify, and Cam Lam's POR books and records were the materials Commerce was verifying. Thus, though Cam Lam takes no issue with Commerce treating Vincent as Cam Lam's successor for future cash-deposit or certification purposes, that post-POR inquiry did not justify rejecting Cam Lam's POR information as missing, withheld, or untimely submitted when it was not missing, not withheld, and was all timely submitted.

Nor does Commerce's citation to Cam Lam's company history response support its conclusion. Commerce stated that Cam Lam "clearly understood" the request was not limited to the POR because Cam Lam provided history beyond the POR, but stopped two months before the name change. IDM at 63. That inference is unreasonable. The cited response addressed capital increases and shareholder-percentage changes while the company still operated under the Cam Lam name, and Cam Lam concluded its response under that question by stating that "{p}lease note that Cam Lam provided the shareholding information in the affiliation chart of Exhibit 3 based on the shareholding situation as effective during the POR." *See* Cam Lam CEQR at 16, **PR 578, CR 346-351**. Thus, the response shows that Cam Lam understood Commerce's questions as directed to the ownership and affiliation information relevant to the POR. At most, the omission reflects a misunderstanding regarding the temporal scope of a general company-history question, not withholding of requested information or significant impediment.

The CIT's decision in *Shandong Yongtai* is instructive. There, the respondent underwent a name change during the POR such that a portion of its POR exports were made under the old company name. The respondent filed the SRA under the new name but noted that it had previously operated under the old name. Commerce granted separate rate status to the entity under the new name but refused to grant separate rate status to the entity under the old name. *See*

32

*Shandong Yongtai Grp. Co. v. United States*, 415 F. Supp. 3d 1303, 1308-10 (Ct. Int'l Trade 2019). The Court rejected Commerce's isolated reliance on the respondent's failure to check two boxes indicating that the SRA applicant was identified by other names and was requesting separate rate status for additional trade names, holding that Commerce's determination was unsupported where the record, including the business-license evidence, showed that the same entity had undergone a simple name change. *Id.* at 1311. The same logic applies here. Commerce cannot reasonably claim that information necessary to the review was missing where Cam Lam was not asked and did not disclose a post-POR name change during the questionnaire stage, yet the name change was fully verified through the company's business license at verification and had no bearing whatsoever on Cam Lam's POR production or exports.

## VII.    Conclusion and Prayer for Relief

In light of the foregoing, Commerce's Final Results were not supported by substantial evidence or in accordance with the law. Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Plaintiff USPLY and Consolidated Plaintiff Cam Lam*

Date: May 11, 2026

**Non-Confidential Version**

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **9,523** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**Inter-Global Trade Law Group**

34