**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| USPLY LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,<br><br>Defendant-Intervenors. | Consol. Court No. 25-00111<br>[redacted] |

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC, 20044
Email: Sosun.Bae@usdoj.gov

*Attorneys for Defendant*

OF COUNSEL:
SAMUIL AGRANOVICH
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C., 20230


September 24, 2026

# TABLE OF CONTENTS


STATEMENT PURSUANT TO RULE 56.2 ........ 2

I. The Administrative Determination Under Review ........ 2

II. Issues Presented For Review ........ 2

STATEMENT OF FACTS ........ 3

I. Issuance of Orders and Circumvention Proceeding ........ 3

II. Underlying Administrative Review ........ 5

SUMMARY OF ARGUMENT ........ 13

ARGUMENT ........ 14

I. Standard of Review ........ 14

II. Commerce Appropriately Applied AFA to Both Win Faith and Cam Lam ........ 16

A. Commerce's Application of AFA to Win Faith Was Supported by Substantial Evidence and in Accordance with Law ........ 16

1. Win Faith's Refusal to Participate in Verification Left Commerce Unable to Verify Win Faith's Questionnaire Responses and Created a Gap in the Record ........ 16

2. Win Faith's Failure to Respond to Commerce's Questionnaire Also Warrants Application of AFA ........ 22

B. Commerce's Application of AFA To Cam Lam Was Supported by Substantial Evidence and in Accordance with Law ........ 27

1. Cam Lam Failed to Make Necessary Personnel and Information Available27

2. Commerce Was Unable to Verify the Accuracy of Cam Lam's Reported Information ........ 29

3. Cam Lam Withheld Necessary Information by Failing to Disclose Its Name Change Before Verification ........ 37

III. Commerce Appropriately Found That Win Faith Was Not Entitled to a Separate Rate ........ 41

IV. Commerce Did Not Abuse Its Discretion in Establishing a Certification Regime Which Requires Both Exporters and Importers to Submit Certifications...............46

A. Commerce's Certification Program Fell Within Its Authority..........................46

B. Commerce Did Not Impinge On CBP's Authority ..........................................48

C. Commerce's Determination to Require Exporter Certifications Addressed Relevant Considerations and Was Supported by Substantial Evidence............50

CONCLUSION..........................................................................................................53

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Advanced Tech. & Materials Co., Ltd. v. United States*,
885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ........ 42

*Aireko Constr., LLC v. United States*,
547 F. Supp. 3d 1350 (Ct. Int'l Trade 2021) ........ 13

*Apex Frozen Foods Priv. Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017) ........ 15

*AMS Associates, Inc. v. United States*,
719 F.3d 1376 (Fed. Cir. 2013) ........ 17

*Biestek v. Berryhill*,
587 U.S. 97 (2019) ........ 15

*Blue Pipe Steel Ctr. Co., Ltd. v. United States*,
803 F. Supp. 3d 1258 (Ct. Int'l Trade 2025) ........ 50

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ........ 45

*Bridgestone Americas Tire Operations, LLC v. United States.*,
--- F. Supp. 3d ----, No. 24-00263, 2026 WL 2114514 (Ct. Int'l Trade July 22, 2026) ........ 39

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........ 14

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ........ 15

*Diamond Tools Tech. LLC v. United States*,
545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) ........ 50

*Fabrique de Fer de Charleroi S.A. v. United States*,
155 F. Supp. 2d 801 (Ct. Int'l Trade 2001) ........ 26

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*,
178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ........ 24, 38

*Goldlink Indus. Co. v. United States,*
431 F. Supp. 2d 1232 (Ct. Int'l Trade 2006) ........ 15

*Goodluck India Ltd. v. United States*,
670 F. Supp. 3d 1353 (Ct. Int’l Trade 2023) ................................................................. 46

*GreenFirst Forest Prods. Inc. v. United Sates*,
647 F. Supp. 3d 1352 (Ct. Int’l Trade 2023) ................................................................. 40

*Greentech Energy Sols., Inc. v. United States*,
714 F. Supp. 3d 1315 (Ct. Int’l Trade 2024) ................................................................. 47

*Heveafil Sdn. Bhd. v. United States*,
58 F. App'x 843 (Fed. Cir. 2003)................................................................................... 33

*Huaiyin Foreign Trade Corp. v. United States*,
322 F.3d 1369 (Fed. Cir. 2003) ..................................................................................... 41

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)........................................................... 29, 40

*Macao Commercial and Industrial Spring Mattress Manufacturer v. United States*,
437 F. Supp. 3d 1324 (Ct. Int’l Trade 2020) ................................................................. 47

*Marsan Gida Sanayi Ve Ticaret A.S. v. United States*,
35 CIT 222 (2011)........................................................................................................... 40

*Maui Pineapple Co. Ltd. v. United States*,
264 F. Supp. 2d 1244 (Ct. Int’l Trade 2003) ................................................................. 27

*Micron Tech., Inc. v. United States*,
117 F.3d 1386 (Fed. Cir. 1997) ..................................................................................... 27

*Mitsubishi Elec. Corp. v. United States,*
44 F.3d. 973 (Fed. Cir. 1994) .................................................................................. 13, 48

*Mitsubishi Elec. Corp. v. United States*,
700 F. Supp. 538 (Ct. Int'l’Trade 1988), *aff'd* 898 F.2d 1577 (Fed. Cir. 1990)......................... 46

*Nat’l Fisheries Inst., Inc. v. United States Bureau of Customs and Border Prot.*,
637 F. Supp. 2d 1270 (Ct. Int’l Trade 2009) ................................................................. 48

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ..................................................................................... 15

*SeAH Steel Corp. v. United States*,
659 F. Supp. 3d 1318 (Ct. Int’l Trade 2023) ................................................................. 40

*SeAH Steel VINA Corp. v. United States*,
950 F.3d 833 (Fed. Cir. 2020) .......... 15

*Shandong Yongtai Grp. Co. v. United States*,
414 F. Supp. 3d 1303 (Ct. Int'l Trade 2019) .......... 40

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
831 F. Supp. 3d 1304 (Ct. Int'l Trade 2026) .......... 26

*Sigma Corp. v. United States*,
117 F.3d 1401 (Fed. Cir. 1997) .......... 41, 45

*SKF USA, Inc. v. United States*,
116 F. Supp. 2d 1257 (Ct. Int'l Trade 2000) .......... 26

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005) .......... 46

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
298 F.3d 1330 (Fed. Cir. 2002) .......... 26

*Tanghenam Elec. Wire & Cable Co. v. United States*,
823 F. Supp. 3d 1321 (Ct. Int'l Trade 2026) .......... 17, 36

*Thyssen Stahl AG v. AK Steel Corp.*,
155 F.3d 574, 1998 WL 455076 (Fed. Cir. July 27, 1998) .......... 29

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) .......... 15

*Torrington Co. v. United States*,
832 F. Supp. 405 (Ct. Int'l Trade 1993) .......... 19

*Tung Mung Dev. Co., Ltd. v. United States*,
219 F. Supp. 2d 1333 (Ct. Int'l Trade 2002), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004) .......... 47

*Vanguard Trading Co. LLC v. United States*,
788 F. Supp. 3d 1277 (Ct. Int'l Trade 2025) .......... 50

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998) .......... 15, 45

*Yantai Timken Co., Ltd. v. United States,*
31 CIT 1741 (2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008) .......... 17

**Statutes**

16 U.S.C. § 3372(f) ... 52

19 U.S.C. § 1516a(b) ... 14

19 U.S.C. § 1517 ... 48

19 U.S.C. § 1677e(a) ... 10, 11, 39

19 U.S.C. § 1677e(b) ... 11

19 U.S.C. § 1677f-1(c) ... 19

19 U.S.C. § 1677m(d) ... 25, 26

19 U.S.C. § 1677m(e) ... 17, 26

19 U.S.C. § 1677m(i) ... 17

**Rules**

Ct Int'l Trade R. 56.2 ... 1

**Regulations**

19 C.F.R. § 351.108(b) ... *passim*

19 C.F.R. § 351.228 ... 47

**Other Authorities**

*Certain Aluminum Foil from the People's Republic of China*,
82 Fed. Reg. 50,858 (Dep't of Commerce Nov. 2, 2017) ... 44

*Certain Hardwood Plywood Products from the People's Republic of China*,
83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) ... 2

*Certain Hardwood Plywood Products from the People's Republic of China*,
83 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) ... 3

*Certain Hardwood Plywood Products from the People's Republic of China*,
89 Fed. Reg. 66,343 (Dep't of Commerce Aug. 15, 2024) .......... 7

*Certain Hardwood Plywood Products from the People's Republic of China*,
89 Fed. Reg. 66,346 (Dep't of Commerce Aug. 15, 2024) .......... 6, 7, 21

*Certain Hardwood Plywood Products from the People's Republic of China*,
90 Fed. Reg. 21, 271 (Dep't of Commerce May 19, 2025) .......... 2, 10

*Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*,
85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020) .......... 3

*Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*,
88 Fed. Reg. 46,740, 46,741 (Dep't of Commerce July 20, 2023) .......... 4

*Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*,
87 Fed. Reg. 45,753 (Dep't of Commerce July 29, 2022) .......... 3, 4

*Initiation of Antidumping and Countervailing Duty Administrative Review*,
88 Fed. Reg. 15,642, 15,650, 15,658 (Dep't of Commerce Mar. 14, 2023) .......... 5

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
86 Fed. Reg. 52,300, 52,364 (Sept. 20, 2021) .......... 47, 51

**Other Authorities**

*Policy Bulletin 05.1*: *Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (2005),
https://www.trade.gov/policy-bulletin-051 .......... 41, 45

S. Rep. No. 100-71 (1987) .......... 47

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| USPLY LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,<br><br>Defendant-Intervenors. | Consol. Court No. 25-00111 |

**ORDER**

Upon consideration of plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's final results are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____________, 2026
New York, NY

_________________________
Chief Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| USPLY LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,<br><br>Defendant-Intervenors. | Consol. Court No. 25-00111<br>[redacted] |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**<u>MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motions for judgment on the agency record filed by plaintiff USPLY LLC (USPLY) and consolidated plaintiffs Vincent Wood Joint Stock Company (Vincent Wood) (formerly known as Cam Lam Vietnam Joint Stock Company) (Cam Lam), Northwest Hardwoods, Inc. (Northwest Hardwoods), and Richmond International Forest Products, LLC (Richmond). *See* Northwest Hardwoods/Richmond Br., ECF No. 50; USPLY/Vincent Wood Br., ECF No. 52. Plaintiffs challenge various aspects of the final results of the U.S. Department of Commerce's (Commerce) administrative review of the antidumping and countervailing duty orders covering certain hardwood plywood from China. As demonstrated below, Commerce's final results are supported by substantial evidence and

otherwise in accordance with law. Accordingly, we respectfully request that the Court deny plaintiffs' motions and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I. The Administrative Determination Under Review

The administrative determination under review is *Certain Hardwood Plywood Products from the People's Republic of China*, 90 Fed. Reg. 21, 271 (Dep't of Commerce May 19, 2025) (*Final Results*) (AD P.R. 783, CVD P.R. 666),[1] and accompanying Issues and Decision Memorandum (IDM) (AD P.R. 781, CVD P.R. 665). The period of review was September 26, 2021, through December 31, 2022.

### II. Issues Presented For Review

1. Whether Commerce's application of facts otherwise available with an adverse inference (AFA) to determine that Win Faith Trading Limited (Win Faith) exported merchandise subject to the orders and was ineligible to participate in the certification regime created during Commerce's affirmative circumvention determination was supported by substantial evidence and otherwise in accordance with law.

2. Whether Commerce's application of AFA to determine that Cam Lam exported merchandise subject to the orders and was ineligible to participate in the certification regime was supported by substantial evidence and otherwise in accordance with law.

3. Whether Commerce's determination that Win Faith was ineligible for a separate rate because it had failed to rebut the presumption that it was controlled by the Government of China (GOC) was supported by substantial evidence and otherwise in accordance with law.

[1] "P.R." refers to documents from the public record index and "C.R." refers to documents from the confidential record index. "AD" and "CVD" are used to differentiate between the indices of the two orders at issue.

4. Whether Commerce abused its discretion in establishing a certification regime that required both exporters and importers to certify that their entries did not include any Chinese inputs as per the production scenarios identified in the related circumvention proceeding.

## STATEMENT OF FACTS

### I. Issuance of Orders and Circumvention Proceeding

In 2018, Commerce published antidumping and countervailing duty orders covering certain hardwood plywood products hardwood plywood from China. *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) (antidumping duty order); *Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) (countervailing duty order).

In 2020, in response to an allegation of circumvention by the domestic industry, Commerce initiated an inquiry into whether certain hardwood plywood products completed in Vietnam using inputs from China, then subsequently imported into the United States as Vietnamese-origin plywood, were circumventing the orders. *See Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020). On July 29, 2022, Commerce preliminarily determined that imports of hardwood plywood products completed in Vietnam using inputs manufactured in China under two of the five investigated production scenarios were circumventing the orders. *See Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 45,753 (Dep't

of Commerce July 29, 2022) (*Circumvention Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM). Accordingly, Commerce instructed U.S. Customs and Border Protection (CBP) to collect cash deposits on entries entered after June 17, 2020, unless presented with certifications from both the exporter and importer that the hardwood plywood was not produced using any of the Chinese input production scenarios identified in the circumvention preliminary determination. *Id.* at 45,754-55. Exporters to which Commerce had applied AFA during the anti-circumvention inquiry were deemed to have produced hardwood plywood under all five of the identified production scenarios and were ineligible to participate in this certification regime; however, Commerce stated that these companies would be given the opportunity to have their eligibility reconsidered through participation in a future administrative review. *See Circumvention Preliminary Determination* PDM at 27.

In its final circumvention determination, Commerce found that imports of hardwood plywood products completed in Vietnam using inputs manufactured in China under all of the five investigated production scenarios were circumventing the orders. *See Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46,740, 46,741 (Dep't of Commerce July 20, 2023) (*Circumvention Final Determination)* and accompanying IDM. In this determination, Commerce found that Cam Lam, Groll Ply and Cabinetry (Groll Ply), and Win Faith had failed to cooperate, and were thus deemed to have produced hardwood plywood under all five Chinese input production scenarios; as such, these companies were precluded from participating in the certification regime. *Id.* at 46,740, 46,743. Commerce also expanded the period of review for the administrative review underlying this litigation, which it had already initiated, to include the earliest entry suspended as

a result of the circumvention preliminary determination (*i.e.*, September 26, 2021). *Circumvention Final Determination* IDM at 181; *see also* IDM at 2.

**II. Underlying Administrative Review**

On March 14, 2023, Commerce initiated the fifth administrative review of the orders, with an initial period of review of January 1, 2022, through December 31, 2022, and covering 98 companies, including—as relevant here—Cam Lam, Groll Ply, and Win Faith. *See Initiation of Antidumping and Countervailing Duty Administrative Review*, 88 Fed. Reg. 15,642, 15,650, 15,658 (Dep't of Commerce Mar. 14, 2023) (AD P.R. 37, CVD P.R. 50).

In August 2023, Commerce received timely "no shipment" certifications and separate rate applications from Cam Lam, Groll Ply, and Win Faith. *See* Cam Lam Separate Rate Application (SRA) & No Shipment Cert. (AD P.R. 122, C.R. 20-21); Groll Ply SRA & No Shipment Cert. (AD P.R. 148, C.R. 113-15); Win Faith SRA & No Shipment Cert. (AD P.R. 144, C.R. 96-97). In November 2023, Commerce issued questionnaires to the companies under review, requesting information regarding their entries of hardwood plywood during the period of review. *See* Q&V Questionnaire (Nov. 20, 2023) (AD P.R. 260; CVD P.R. 173). Commerce received responses from Cam Lam, Groll Ply, and Win Faith, who all reported that their suspended entries consisted exclusively of non-subject merchandise. *See* Cam Lam Q&V Questionnaire Resp. (Dec. 7, 2023) (AD P.R. 306, C.R. 205; CVD P.R. 206, C.R. 85); Groll Ply Q&V Questionnaire Resp. (Dec. 7, 2023) (AD P.R. 293, C.R. 180; CVD P.R. 193, C.R. 60); Win Faith Q&V Questionnaire Resp. (Dec. 7, 2023) (AD P.R. 305, C.R. 204; CVD P.R. 205, C.R. 84).

In February 2024, Commerce issued Cam Lam, Groll Ply, and Win Faith certification eligibility questionnaires. *See* Feb. 2 Certification Eligibility Questionnaire (CEQ) (AD P.R. 329; CVD P.R. 228); Feb. 29 CEQ (AD P.R. 373; CVD P.R. 273). In the questionnaires,

Commerce instructed companies to indicate whether they were requesting reevaluation of their eligibility to participate in the certification program and to provide general information on their corporate structures and accounting practices, specific information on their sales of hardwood plywood to the United States, and detailed descriptions of their production processes and veneer sourcing practices. *See* Feb. 2 CEQ at 4-18 (AD P.R. 329); Feb. 29 CEQ at 4-18 (AD P.R. 373). Commerce received responses from Cam Lam and Win Faith; Groll Ply did not respond. *See* Cam Lam CEQ Resp. (Mar. 21, 2024) (AD C.R. 346-51; CVD C.R. 226-31); Cam Lam Corrected Public CEQ Resp. (Aug. 5, 2024) (AD P.R. 578; CVD P.R. 468); Win Faith CEQ Resp. (Mar. 28, 2024) (AD P.R. 410, C.R. 353-57; CVD P.R. 309, C.R. 233-37).

In April 2024, Commerce issued a supplemental questionnaire to Win Faith regarding its ownership structure and affiliates, to which Win Faith responded. *See* Win Faith Supp. SRA Questionnaire (Apr. 25, 2024) (AD P.R. 446, C.R. 396); Win Faith Supp. SRA Questionnaire Resp. (May 7, 2024) (AD P.R. 461, C.R. 405-16). In June 2024, Commerce issued Win Faith a supplemental certification eligibility questionnaire, soliciting additional information regarding the company's financial statements, as well as its suppliers' production and sourcing practices. *See* Win Faith Supp. CEQ (June 13, 2024) (AD P.R. 526; CVD P.R. 418). Win Faith responded to this questionnaire as well. *See* Win Faith Supp. CEQ Resp. (June 20, 2024) (AD P.R. 536, C.R. 546; CVD P.R. 428, C.R. 408); Win Faith Supp. CEQ Resp. (July 18, 2024) (AD P.R. 565, C.R. 703-05; CVD P.R. 456, C.R. 565-67).

Commerce published its preliminary results on August 15, 2024. *See Certain Hardwood Plywood Products from the People's Republic of China*, 89 Fed. Reg. 66,346 (Dep't of Commerce Aug. 15, 2024) (*AD Preliminary Results*) (AD P.R. 587), and accompanying PDM (AD P.R. 588); *Certain Hardwood Plywood Products from the People's Republic of China*, 89

Fed. Reg. 66,343 (Dep't of Commerce Aug. 15, 2024) (*CVD Preliminary Results*) (CVD P.R. 474), and accompanying PDM (CVD P.R. 475). Commerce preliminarily determined that Cam Lam and Win Faith did not sell or export subject merchandise during the period of review, and stated that, if this determination remained unchanged in the final results, both companies would be permitted to participate in the certification program. AD PDM at 12, 21, and Appendix II; CVD PDM at 12, 21, and Appendix II. However, Commerce explicitly noted that it intended to solicit additional information from certain companies under review, including Cam Lam and Win Faith, and to "verify their no shipment claims prior to issuing the final results." AD PDM at 12; CVD PDM at 12. Commerce also found that, because Groll Ply did not respond to the certification eligibility questionnaire, it had not cooperated to the best of its ability and Commerce did not have the information necessary to determine whether Groll Ply shipped subject merchandise during the period of review; Commerce thus preliminarily assessed an AFA rate to Groll Ply. *See AD Preliminary* Results, 89 Fed. Reg. at 66,348, and accompanying PDM at 4, 20; *CVD Preliminary Results,* 89 Fed. Reg. at 66,344, and accompanying PDM at 4, 15-21.

On August 14, 2024, Commerce informed Cam Lam as to the time and location of its verification. Cam Lam Verification Schedule (Aug. 14, 2024) (AD P.R. 598; CVD P.R. 485). And on August 30, 2024, Commerce provided Cam Lam with the verification agenda. Cam Lam Verification Agenda (Aug. 30, 2024) (AD P.R. 629, C.R. 768; CVD P.R. 516; C.R. 629). In the verification agenda, Commerce requested that Cam Lam have prepared source documentation for its purchase orders and other sales-related documents by the first day of verification; Commerce also explicitly stated that the "personnel who are knowledgeable about the data in the response and the underlying accounting systems" should be made available. *Id.* at 4-5.

Commerce conducted its verification of Cam Lam from September 9-11, 2024. *See* Cam Lam Verification Report at 1 (Nov. 20, 2024) (AD P.R. 724, C.R. 860-85; CVD P.R. 611, C.R. 722-48). During verification, Commerce discovered for the first time that Cam Lam had, in 2023, changed its name to Vincent Wood Joint Stock Company (Vincent Wood).[2] *Id.* at 3 (AD P.R. 724) and VE-2 at 2, 12 (AD C.R. 861); *see also* IDM at 62. However, in Cam Lam's initial certification eligibility questionnaire response, submitted *after* the name change, the company had referred to itself exclusively as Cam Lam and provided a company certification of accuracy signed by "Ye Shuping, General Manager, currently employed by Cam Lam Vietnam Joint Stock Company." Cam Lam Corrected CEQ Resp. at 7 (AD P.R. 578). Moreover, in its "full narrative history" of the company, Cam Lam had described its history beyond the period of review, but ended that narrative history two months before the name change. Cam Lam CEQ Resp. at 16 (AD C.R. 346); *see also* IDM at 63.

At verification, Commerce asked Cam Lam to provide additional context regarding its purchase orders, which had been presented in the form of worksheets with several rows and columns. Cam Lam Verification Report at 11 (AD P.R. 724). Cam Lam officials explained that its purchase orders are typically received as attachments in WeChat or to an email and "were solely available on Cam Lam's sales manager's laptop." *Id.* When Commerce verifiers asked to see the original documents, they were informed by Cam Lam officials that those documents were "not readily available because the sales manager, Mr. Sun, was not on-site." *Id.* The Cam Lam officials explained that Mr. Sun was in China because his flight had been cancelled due to weather issues the weekend prior to verification, and Cam Lam had determined he did not need

[2] For ease of reference, we generally refer to this company as "Cam Lam" unless distinguishing between Cam Lam and Vincent Wood.

to rebook another flight. *Id.* While Cam Lam offered to host a videoconference with Mr. Sun the following day, Commerce verifiers were only able to observe Mr. Sun's laptop through his phone camera. *Id.* at 11-12. Given the in-person unavailability of Mr. Sun and his laptop and the difficulties of viewing the laptop through videoconference via a phone camera, Commerce was "unable to completely query his system or fully understand the scope of the records maintained on his computer." *Id.* And, when the Commerce verifiers attempted to confirm Mr. Sun's explanation for his absence by asking to see a visa showing that he was able to enter Vietnam at the time of verification, he stated that his visa was not with him, but rather in a room that he rents an hour away to keep his cat away from his baby. *Id.* at 11.

Commerce was also unable to confirm how Cam Lam linked customer payment to specific sales. Cam Lam Verification Report at 12. For each sales trace, Cam Lam provided a table with commercial invoices and invoice value, and another with payment dates and payment amounts. *Id.* When Commerce verifiers asked Cam Lam officials how they were able to determine that the payments listed in one table related to the invoices listed in the other, they explained that "they were able to identify linkages of payments using a tracking system maintained by Mr. Sun." *Id.* Due to the absence of Mr. Sun, who Cam Lam officials had unilaterally determined did not need to be present at verification following the cancellation of his initial flight, Commerce could not examine this tracking system. *Id.* at 11-12.

With respect to Win Faith, on September 5, 2024, Commerce issued a second supplemental certification eligibility questionnaire seeking further information on numerous issues, including: discrepancies in Win Faith's U.S. sales database; whether its parent company, which Win Faith had reported is "a trading company with no production activities," was "involved in the production of plywood" during the period of review; the fact that Win Faith had

reported that it did not export any hardwood plywood to the United States through a reseller, yet listed resellers in its U.S. sales database; and whether Win Faith is a trading company with no production activity in light of the fact that "several accounts listed in Win Faith's chart of accounts suggest otherwise." Win Faith 2nd Supp. CEQ at 3, 5-7 (Sept. 5, 2024) (AD P.R. 639, C.R. 797; CVD P.R. 525, C.R. 657). On October 8, 2024, Commerce informed Win Faith when and where its verification would take place. Win Faith Verification Schedule (Oct. 8, 2024) (AD P.R. 706; CVD P.R. 593). On October 22, 2024, Win Faith notified Commerce "that it is unable to respond to the supplemental questionnaire or defend verification in this review." Win Faith Notice of Intent Not to Participate (Oct. 22, 2024) (AD. P.R. 710; CVD P.R. 597).

Commerce published its final results on May 19, 2025. *See Final Results*, 90 Fed. Reg. 21,271, and accompanying IDM. In the final results, Commerce changed course and determined to apply AFA to both Cam Lam and Win Faith. With respect to Cam Lam, Commerce found that, because Cam Lam had failed to make necessary documentation and appropriate personnel available during verification, Commerce could not verify the information provided by Cam Lam pursuant to 19 U.S.C. § 1677e(a)(2)(D), and that, because Cam Lam failed to disclose its name change until verification, it had withheld crucial information, failed to report information in the form and manner requested, and significantly impeded the proceeding pursuant to section 1677e(a)(2)(A)-(C). IDM at 55, 62-63 (AD P.R. 780). Commerce also found that Cam Lam had failed to act to the best of its ability pursuant to section 1677e(b)(1), meriting the application of AFA. *Id.* at 64. As AFA, Commerce found that Cam Lam's entries for the period of review were subject to the orders, Cam Lam remained ineligible to participate in the certification program, and Vincent Wood was the successor-in-interest to Cam Lam. *Id.* at 7, 64.

Commerce found that Win Faith's failure to respond to the second supplemental questionnaire and refusal to participate in verification created gaps in the record pursuant to 19 U.S.C. § 1677e(a)(1) and that Win Faith had withheld information, provided information that could not be verified, and significantly impeded the proceeding pursuant to section 1677e(a)(2)(A)-(D). IDM at 30-31. Commerce also found that, because Win Faith did not provide information in its possession and refused verification, it had failed to act to the best of its ability pursuant to section 1677e(b). *Id.* at 31. Accordingly, Commerce determined as AFA that Win Faith's entries for the period of review were generally subject to the orders[3] and that Win Faith remained ineligible to participate in the certification program. *Id.* at 7, 31-32.

In assigning a rate to Win Faith, Commerce determined that, under 19 C.F.R. § 351.108(b)(1)(i)(A), Win Faith was under the *de facto* control of the GOC. IDM at 33-34. Commerce found that Win Faith's organizational chart showed that "two state-owned enterprises, along with another GOC-controlled entity," indirectly own a majority ownership share of Win Faith. *Id.* at 33 (citing Win Faith Supp. SRA Questionnaire Resp. at Exh. SQ1-1 (AD C.R. 405)). Commerce also noted that the GOC could potentially exert influence or control over Win Faith because one of Win Faith's directors holds a management position in Win Faith's parent company and one of the parent company's holding companies, both of which are indirectly controlled by state-owned enterprises. *See id.* (citing Win Faith Supp. SRA Questionnaire Resp. at Exh. SQ1-5 (AD C.R. 411); Win Faith SRA & No Shipment Cert. at Exh. 4 (AD C.R. 96-97)).

[3] For sales produced by two suppliers of Win Faith that were reported in the suppliers' databases as resold by Win Faith to the United States, and that Commerce was able to verify, Commerce determined that there was no gap in the record and that those sales did not contain merchandise subject to the orders. IDM at 32-33 (citing Win Faith BPI Memo (May 12, 2025) (AD P.R. 782, C.R. 1422; CVD P.R. 665, C.R. 1283)).

Finding Win Faith ineligible for a separate rate, Commerce assigned the company the cash deposit rate of the China-wide entity. *Id.* at 34.

Finaly, Commerce rejected arguments from U.S. importers requesting that they be permitted to submit information to CBP demonstrating that their imports do not include merchandise subject to the orders without also including an accompanying exporter certification. *See* IDM at 17-24. Commerce explained that importers are not expected to have direct personal knowledge of the facts regarding production of their imported plywood, including the country of origin of the material inputs, whereas exporters are expected to have such information in their possession. *Id.* at 18-20. In addition, Commerce observed that allowing importers alone to certify that their entries are not subject to the orders would create a loophole allowing uncooperative exporters to provide false and unverified production information to importers, disincentivizing future cooperation by those exporters. *Id.* at 19-20, 23. And, while the importers argued that they had demonstrated on the record of the proceeding that they can obtain and maintain country of origin information for material inputs, Commerce found that this information did not include supporting documentation regarding the country of origin of the core veneer used to produce the hardwood plywood. *Id.* at 20-21.

The importers also argued that, in other circumstances, Commerce has allowed certifications from only importers, but Commerce explained that those circumstances were distinguishable, as they concerned certifications for which importers either actually have direct personal knowledge regarding the relevant facts or do not involve importers whatsoever. *Id.* at 21-22. Finally, Commerce rejected the importers' argument that the certification program "abrogate{es} CBP's inherent authority to verify information declared by the importer." *Id.* at 22 (quoting U.S. Importers' Case Br. at 11 (AD P.R. 749)). Commerce explained that the Court

of Appeals for the Federal Circuit has held that CBP cannot modify Commerce determinations or their enforcement, but has a ministerial role in liquidating antidumping duties, and that, pursuant to regulation, Commerce has the authority to direct CBP to suspend entries, collect cash deposits, and liquidate unsuspended entries after a circumvention finding. *Id.* at 22 (citing *Mitsubishi Elec. Corp. v. United States,* 44 F.3d. 973, 977 (Fed. Cir. 1994); *Aireko Constr., LLC v. United States*, 547 F. Supp. 3d 1350, 1357 (Ct. Int'l Trade 2021)).

**SUMMARY OF ARGUMENT**

The Court should sustain Commerce's final results. Substantial evidence supports both Commerce's application of AFA to Win Faith and Cam Lam. Win Faith completely failed to respond to Commerce's post-preliminary supplemental certification eligibility questionnaire and refused to participate in verification. Because a gap in the record was created by the lack of response to the questionnaire and Commerce could not verify the reliability of the information that Win Faith did provide, Commerce appropriately determined to apply facts available. And because Win Faith obviously failed to cooperate to the best of its ability, Commerce also appropriately applied an adverse inference.

Unlike Win Faith, Cam Lam participated in verification. However, Cam Lam failed to make available the sales manager who had ordered Cam Lam's raw material inputs and maintained the company's payment tracking and source documents for its purchase orders. Indeed, Cam Lam did not even make available the sales manager's laptop, which contained necessary information. As such, Commerce could not verify that Cam Lam could track its raw material inputs throughout production Commerce also discovered for the first time at verification that Cam Lam had undergone a name change in 2023 but had failed to disclose this name change, continuing to represent itself as Cam Lam throughout the review. As a result of

Cam Lam's failures, Commerce properly found that Cam Lam withheld information, failed to report information in the form and manner requested, significantly impeded the proceeding, and did not act to the best of its ability.

Commerce also correctly determined that Win Faith had failed to rebut the presumption of *de facto* government control. Win Faith's organization chart demonstrates that it is indirectly controlled by two GOC state-owned enterprises and another GOC-controlled entity. In addition, the record shows that one of Win Faith's directors holds a management position in both of Win Faith's parent companies and one of the parent company's holding companies, both of which are indirectly controlled by state-owned enterprises.

Finally, Commerce did not abuse its discretion in creating a certification program which requires both exporters and importers to certify that the imported merchandise is not subject to the orders. Commerce acted lawfully pursuant to its authority to craft certification regimes and transmit liquidation instructions, as well as its statutory obligation to prevent the intentional evasion or circumvention of antidumping and countervailing duties. Commerce also addressed relevant party arguments and assessed various considerations in concluding that information from exporters should remain a requirement of the certification program.

## ARGUMENT

### I. Standard of Review

In reviewing a challenge to a final determination by Commerce, this Court holds Commerce's determination lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Biestek*

*v. Berryhill*, 587 U.S. 97, 102-03 (2019). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 842-43 (Fed. Cir. 2020).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States,* 431 F. Supp. 2d 1232, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted) (emphasis in original omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, "{a} party challenging {Commerce's} determination under the substantial evidence standard has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks omitted) (citation omitted). Finally, Commerce's path need only be reasonably discernible for its decision to be upheld. *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1347 (Fed. Cir. 2017) ("A court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) ("A court may uphold an agency's decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up).

## II. Commerce Appropriately Applied AFA to Both Win Faith and Cam Lam

### A. Commerce's Application of AFA to Win Faith Was Supported by Substantial Evidence and in Accordance with Law

While plaintiffs lodge a number of arguments against Commerce's application of AFA,[4] they largely elide the simple facts that Win Faith failed to respond to one of Commerce's questionnaires and refused to participate in verification. Plaintiffs cannot establish that, despite this clear failure to cooperate, Commerce was required to rely on Win Faith's unverifiable questionnaire responses and find it eligible for the certification program.

#### 1. Win Faith's Refusal to Participate in Verification Left Commerce Unable to Verify Win Faith's Questionnaire Responses and Created a Gap in the Record

Commerce appropriately found that Win Faith's refusal to participate in verification left Commerce unable to verify much of the information pertinent to Win Faith's eligibility for certification. Plaintiffs argue that the information Win Faith submitted in the questionnaire responses it actually tendered to Commerce demonstrates that it did not export subject merchandise during the period of review and that Commerce should not disregard this information without other information on the record calling Win Faith's earlier representations into question. *See* Northwest Hardwoods/Richmond Br. at 20-21.

Plaintiffs misunderstand both the law and Commerce's reasoning. While Win Faith submitted wood origin documents in its certification eligibility questionnaire and first

[4] Plaintiffs request that this Court find that both Groll Ply and Win Faith "are eligible to provide certifications showing that their merchandise was not produced under one of the five circumventing scenarios." Northwest Hardwoods/Richmond Br. at 4. But neither in their complaint nor their opening brief do plaintiffs assert that Commerce unlawfully applied AFA to Groll Ply. As such, to the extent that plaintiffs' request regarding Groll Ply is based on anything other than its meritless argument that Commerce abused its discretion in setting the parameters for the certification regime, the Court should not consider it.

supplemental responses, it refused to participate in verification; as such, Commerce was unable verify the production processes and tracing systems for all but one of the suppliers for which Win Faith had provided wood origin documents. *See* IDM at 30 (citing Win Faith CEQ Resp. at Exh. 11 (AD C.R. 354-55); Win Faith Supp. CEQ Resp. at Exh. 2-7 (AD C.R. 703-05)). The relevant statute does not require information to be "entirely absent" to be considered missing from the record; rather, "it is sufficient that the information Commerce requires to perform its analysis is unreliable." *Tanghenam Elec. Wire & Cable Co. v. United States*, 823 F. Supp. 3d 1321, 1332 (Ct. Int'l Trade 2026).

Plaintiffs appear to believe that Commerce may not disregard unverified information unless detracting evidence exists on the record, even if a respondent refuses to participate in verification. But 19 U.S.C. § 1677m(i)(3) explicitly directs Commerce to verify "all information relied upon in making . . . a final determination in a review," and Commerce frequently disregards information that it is unable verify. *See, e.g., AMS Associates, Inc. v. United States*, 719 F.3d 1376, 1380 (Fed. Cir. 2013) ("{i}n disregarding information that it could not verify, Commerce did not act contrary to law"); *Yantai Timken Co., Ltd. v. United States,* 31 CIT 1741, 1753 (2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008) (citing 19 U.S.C. § 1677m(i)(3)). Moreover, section 1677m(e)(2) states that Commerce shall not decline to consider information submitted by an interested party if "*the information can be verified*." Commerce's prerogative to disregard information that cannot be verified makes sense; if Commerce were required to rely on information that it did not verify unless contrary evidence exists on the record, respondents would be incentivized to submit incorrect or unreliable questionnaire responses to Commerce then simply refuse to participate in verification. Commerce correctly concluded that Win Faith's

failure to submit raw material input tracing information that could be verified created a gap in the record.

While plaintiffs contend that Commerce's rationale was not "reasonably discernable," Northwest Hardwoods/Richmond Br. at 22, Commerce explicitly stated that, "given Win Faith's refusal to 'defend verification in this review'" Commerce was "unable to confirm the provenance of these documents or confirm their veracity." IDM at 30. Commerce further explained that "there is . . . a gap left by Win Faith's failure to submit information that could be verified" and that it "did not rely on Win Faith's responses in making this decision, given that that {Commerce does} not consider the information reported by Win Faith to be reliable." IDM at 31, 33. Commerce's path to declining to use Win Faith's information was not merely reasonably discernible, it was obvious.

Plaintiffs claim that the crux of Commerce's rationale for discarding the information in Win Faith's responses was that the input sourcing documentation accounted for only 26 percent of Win Faith's suppliers and that the information was self-selected. Northwest Hardwoods/Richmond Br. at 22. Not so. As explained above, the unverified nature of Win Faith's responses is alone sufficient grounds for Commerce to disregard Win Faith's questionnaire responses and apply AFA.[5] However, Commerce also reasonably found that the information Win Faith provided was incomplete because it only related to 26 percent of the suppliers identified in Win Faith's sales database, and thus was "*in and of itself* . . . insufficient to demonstrate that Win Faith's suppliers have production systems which can trace the origin of the inputs used in the hardwood plywood Win Faith exported." IDM at 30 (citing Win Faith CEQ

[5] Certainly, Win Faith cannot plausibly claim that it cooperated to the best of its ability when it refused to participate in verification and respond to one of Commerce's questionnaires.

Resp. at Exh. 11 (AD C.R. 354-55); Win Faith Supp. CEQ Resp. at Exh. 2-7 (AD C.R. 703-05)). There is nothing amiss in Commerce's reasoning that 26 percent was not sufficient to demonstrate that Win Faith's suppliers could trace the origin of their inputs.

Moreover, plaintiffs' assertion that Commerce rejected Win Faith's questionnaire responses "merely on the basis that Win Faith providing {sic} a sampling of tracing documents," Northwest Hardwoods/Richmond Br. at 22 (citing 19 U.S.C. § 1677f-1(c)(2); *Torrington Co. v. United States*, 832 F. Supp. 405 (Ct. Int'l Trade 1993)), is—even accepting the premise of the inaccurate statement—based on inapposite legal authority. The statutory provision plaintiffs rely on relates to Commerce's selection of respondents for mandatory examination. *See* 19 U.S.C. § 1677f-1(c)(2). And, in any event, section 1677f-1(b) explicitly vests the authority to select samples "exclusively" with Commerce. Finally, *Torrington* makes clear that Commerce may accept a respondent's proposed sampling methodology so long as it determines "that it is reasonable and representative," and that "this is especially true in situations where {Commerce} was able to verify the information submitted." *See Torrington*, 832 F. Supp. at 410. The authority cited by Win Faith does not support the proposition that Commerce must accept a 26 percent selection of suppliers as a representative sample demonstrating that Win Faith's suppliers have production systems that can trace the origin of the inputs used in Win Faith's merchandise, particularly given that Win Faith itself refused to participate in verification.

Plaintiffs also contend that Commerce failed to consider evidence that detracted from the weight of its conclusion, specifically, Commerce's verification of two of Win Faith's suppliers as using Win Faith as a reseller of non-circumvented merchandise. Northwest Hardwoods/ Richmond Br. at 23 (citing IDM at 32). Per plaintiffs' flawed reasoning, this means that Commerce could confirm the accuracy of Win Faith's reporting based on the information

submitted by other exporters. *Id.* But plaintiffs' contention ignores that Commerce stated on the very same page of its IDM that, because Commerce verified that the two suppliers did not ship or sell hardwood plywood consisting of Chinese core inputs, it would liquidate the sales from those suppliers without regard to antidumping and countervailing duties because they are not subject to the orders. IDM at 32. It is clear that Commerce *did* consider the evidence but did not deem it sufficient to confirm the overall accuracy of Win Faith's reporting. This is especially so given Commerce's finding that:

> Win Faith also reported that it resold hardwood plywood . . . produced by Supplier C. However . . . Supplier C did not report any sales to the United States via Win Faith in its U.S. sales listing. Therefore, we have insufficient basis to find that Win Faith's reported, unverified sales of hardwood plywood, which it claimed to purchase from Supplier C, are outside the scope of the *Orders*.

IDM at 32 (citing Win Faith BPI Memo at 2 (AD C.R. 1422)).

Plaintiffs next contend that Commerce acted unlawfully by disregarding Win Faith's submissions when it accepted similar information from other respondents. Northwest Hardwoods/Richmond Br. at 23-24. But the only example plaintiffs point to is Commerce's reliance on input tracing documents from Arrow Forest's supplier in finding that Arrow Forest should be permitted to participate in the certification regime. *Id.* at 24 (citing IDM at 40). Plaintiffs miss the crucial point that Commerce actually *verified* Arrow Forest's purchases "and found no evidence that it sourced any of those core input materials from China." IDM at 40. Unlike Arrow Forest, Win Faith refused to undergo verification, depriving Commerce of the opportunity to conduct a similar analysis.

Finally, plaintiffs argue that Commerce unlawfully rejected information submitted by importers that allegedly independently corroborated Win Faith's reporting. *See* Northwest Hardwoods/Richmond Br. at 24. Specifically, they claim that Northwest Hardwoods' supplier

audit reports show that Win Faith was not exporting subject merchandise. *Id.* (citing Northwest Hardwoods Audit Reports (Apr. 18, 2024) (AD P.R. 431, C.R. 378; CVD P.R. 329, C.R. 258)). According to plaintiffs, Commerce erroneously found this information was inadequate because it was a "third party report without supporting documentation" and "somehow less reliable because it was in list form." *Id.* at 24-25.

This mischaracterizes Commerce's reasoning. Commerce considered the documents from Northwest Hardwoods and other importers, but determined that they did not contain and were not accompanied by supporting or identifying information that could be used to demonstrate the country of origin of the core veneer inputs used to produce plywood. *See* IDM at 20. Commerce explained that, in contrast to respondents who had provided source documents to support their input country of origin claims, these importers' information did not include documents like "the Lists of Foresty Products {which} identify the location where the wood was harvested," "identification documents of the log harvester," or "core veneer supply contracts." IDM at 21. Commerce did not base its determination on the information being in "list form."

Importantly, Commerce also explained that the information submitted by exporters regarding production processes and sales was verified for accuracy with those who have firsthand knowledge, whereas secondhand information from importers can only be verified by the exporters themselves as to its accuracy. IDM at 21. As an example of probative information, plaintiffs rely on Exhibit 1 of Northwest Hardwoods' supplier audit reports, which [redacted]. *See AD Preliminary Results* PDM at 4, 20 (AD P.R. 588); IDM at 30 ("we were unable to independently verify any of the information about {Groll Ply'}s production process or tracing systems."). But while the report asserts that [redacted]

[redacted]. Northwest Hardwoods NFI at Exh. 1 (C.R. 378). Additionally, while auditors claim that a [redacted] Commerce noted "that species is not, in and of itself, a determining factor for the country of origin of wood. IDM at 21 (citing Petitioner Rebuttal Factual Information (Mar. 18, 2024) (AD P.R. 403, C.R. 345; CVD P.R. 302, C.R. 225); *see also* Northwest Hardwoods NFI at Exh. 1; Petitioner Rebuttal Case Br. at 18 (C.R. 1419). Commerce reasonably concluded that secondary information from Northwest Hardwoods and other importers could not satisfy the direct personal knowledge requirement.

Following Win Faith's refusal to participate in verification, Commerce reasonably determined that Win Faith's information could not be verified and, as a result, there was a gap in the record as to its suppliers' input sourcing and Win Faith had significantly impeded the proceeding. IDM at 31. Commerce thus appropriately applied facts available. And there can be no serious question that Win Faith's failed to cooperate to the best of its ability when it refused to participate in verification. As such, Commerce correctly applied AFA to Win Faith.

#### 2. Win Faith's Failure to Respond to Commerce's Questionnaire Also Warrants Application of AFA

Commerce's application of AFA to Win Faith can be justified on its verification refusal alone. Similarly, the Court could sustain Commerce's determination solely on the basis of Win Faith's refusal to respond to Commerce's second supplemental questionnaire, as Commerce reasonably found that a gap in the record was left by Win Faith's non-response and that Win Faith did not act to the best of its ability when it failed to provide the information. IDM at 31.

Despite the self-evident proposition that not responding to a questionnaire creates a gap in the record, plaintiffs contend that no gap exists because the questionnaire was not relevant to the country of origin of the hardwood plywood Win Faith exported to the United States. Northwest Hardwoods/Richmond Br. at 26-27. In making this argument, plaintiffs claim that Commerce's questions only relate to Win Faith's sales database, its corporate relationships, and its purported status as a mere trading company. *Id.* at 27-28. But they mischaracterize the nature of these questions.

First, plaintiffs minimize Commerce's questions about Win Faith's sales database as seeking clarification of "minor discrepancies in quantity and value information." *Id.* at 28. But what plaintiffs describe as "minor" constitutes a discrepancy of [redacted] cubic meters in quantity and [redacted] in value. *See* Win Faith 2nd Supp. CEQ at 5 (AD C.R. 797). Characterizing a discrepancy of over [redacted] in value as minor strains credulity.

Second, plaintiffs construe Commerce's questions about "Win Faith's corporate relationships" as merely clarifying which entities could be considered affiliates and aspects of Win Faith's financial statements. Northwest Hardwoods/Richmond Br. at 28. What plaintiffs omit, however, is that the questionnaire asks Win Faith to support its assertion that its parent company is a "trading company with no production activities" in light of evidence that the company operates [redacted] and has [redacted] Win Faith 2nd Supp. CEQ at 5-6 (AD C.R. 797) (citing Petitioner Comments on Win Faith CEQ Resp. at Exh. 4 (Apr. 29, 2024) (AD P.R. 451, C.R. 398; CVD P.R. 347, C.R. 277)). The questionnaire also directs Win Faith to explain why, if it "did not export hardwood plywood from Vietnam to the United States through any resellers," it lists resellers for certain sales in its U.S. sales

database. *Id.* at 6. How the answers to these inquiries are relevant to the "core question of whether Win Faith . . . sold circumventing merchandise" is not cloaked in mystery. Northwest Hardwoods/Richmond Br. at 26.

Third, plaintiffs assert that Commerce's request for additional information regarding Win Faith's assertion that it was a "mere trading company with no production activity" would not have solicited information addressing whether it resold circumventing merchandise to the United States during the period of review. *Id.* at 28. Commerce asked Win Faith to explain why its chart of accounts includes [redacted] Win Faith 2nd Supp. CEQ at 7 (AD C.R. 797). While plaintiffs may believe that Commerce's questions on manufacturing process were not relevant to Win Faith, Commerce was under no obligation to accept this claim at face value, particularly given its inability to conduct verification. *See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1326-27 (Ct. Int'l Trade 2001) ("Commerce need not accept at face value a respondent's 'mere statements' on the nature, quality, or relevance of the information it submits. . . . Otherwise, verification would be pointless").

Plaintiffs also elevate form over substance, noting that the heading "Production Information" is absent from the second supplemental questionnaire. Northwest Hardwoods/Richmond Br. at 28. But the heading does not dictate whether Commerce's actual questions are relevant to its consideration of whether Win Faith had plywood production using Chinese-origin core inputs. Moreover, Win Faith ignores that Commerce had requested Win Faith answer questions under the "Production Information" header in its initial certification

eligibility questionnaire, but Win Faith answered that the questions were "not applicable to Win Faith, since Win Faith is a mere trading company with no production activity." CEQ at Part 3 (AD P.R. 373); Win Faith CEQ Resp. at 19 (AD P.R. 410). It would have been futile for Commerce to once again request Win Faith answer "Production Information" questions without first seeking to clarify whether Win Faith had unreported production, which is what Commerce did in its second supplemental questionnaire.

The questions posed by Commerce in its second supplemental questionnaire were not so irrelevant that Commerce could not reasonably find that a gap in the record existed as to whether Win Faith was circumventing the orders. Rather, they clearly relate to whether Win Faith's production reporting is reliable. As Commerce explained, Win Faith's failure to respond to the questionnaire "leaves open the possibility that Win Faith had unreported plywood production – using unreported Chinese-origin core inputs – during the POR." IDM at 30. Whether Win Faith had unreported plywood production is relevant to Commerce's determination as to whether Win Faith should be permitted to participate in the certification program, given that the unreported plywood could have used core inputs from China. Commerce properly determined that Win Faith's failure to respond created a gap in the record and that it had significantly impeded the proceedings. And, as with the refusal to participate in verification, it is indisputable that Win Faith failed to act to the best of its ability.

Finally, plaintiffs claim that, because Commerce relied on Win Faith's submissions when it preliminarily determined that Win Faith did not sell or export subject merchandise during the POR and did not solicit additional information from Win Faith on its ability to trace the source of its inputs, Commerce was required to provide Win Faith an opportunity to remedy its deficiencies under 19 U.S.C. § 1677m(d). Northwest Hardwoods/Richmond Br. at 29-30. But

Commerce preliminarily relying on Win Faith's submissions is not relevant to whether the requirements of section 1677m(d) are triggered. Moreover, Commerce is not required to issue a deficiency notice under section 1667m(d) when a respondent completely fails to respond to a supplemental questionnaire. *See Shelter Forest Int'l Acquisition, Inc. v. United States*, 831 F. Supp. 3d 1304, 1346 (Ct. Int'l Trade 2026); *see also Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002).

In any event, Commerce satisfied its obligation under section 1677m(d) when it issued its first supplemental questionnaire in June 2024. There, Commerce requested that Win Faith "provide complete responses to Part 3 of the CEQ *for all manufacturers* in your sales database . . . *as originally requested*." Win Faith Supp. CEQ at 4 (AD P.R. 526) (emphasis added). Win Faith responded that it had forwarded part 3 of the certification eligibility questionnaire to its suppliers multiple times, but that it had "no leverage to induce their cooperation." Win Faith Supp. CEQ Resp. at 2 (AD C.R. 703). Once Win Faith informed Commerce that it could not provide the requested information, Commerce was not obligated to send a second supplemental questionnaire asking for the same information. *See SKF USA, Inc. v. United States*, 116 F. Supp. 2d 1257, 1268 (Ct. Int'l Trade 2000) ("1677m(d) does not impose on Commerce a requirement that it must . . . issue a second supplemental questionnaire"). Additionally, under 19 U.S.C. § 1677m(e)(3), Commerce is only barred from declining to consider information *if* "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination," which Commerce has the discretion to determine. *See Fabrique de Fer de Charleroi S.A. v. United States*, 155 F. Supp. 2d 801, 808 (Ct. Int'l Trade 2001) ("Commerce had discretion in determining whether . . . the 'information [redacted]

[redacted] not so incomplete that it [redacted] serve as a reliable basis for reaching the applicable determination'").

Because Commerce appropriately applied AFA to Win Faith and plaintiffs cannot demonstrate otherwise, the Court should sustain.

**B. Commerce's Application of AFA To Cam Lam Was Supported by Substantial Evidence and in Accordance with Law**

As with Win Faith, Commerce reasonably applied AFA to Cam Lam based on issues encountered during verification of Cam Lam's questionnaire responses, including Cam Lam not making certain important personnel and information available, the inability to verify certain information, and Cam Lam's failure to disclose its name change.

**1. Cam Lam Failed to Make Necessary Personnel and Information Available**

It is axiomatic that Commerce has broad discretion in how it conducts verification, given that Congress has delegated to Commerce "the latitude to derive verification procedures ad hoc." *Maui Pineapple Co. Ltd. v. United States*, 264 F. Supp. 2d 1244, 1259 (Ct. Int'l Trade 2003); *see also Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997). In the verification agenda Commerce sent to Cam Lam prior to verification, Commerce explicitly provided a list of "source documents that will be examined during verification," including purchase orders, and directed that "{a}ppropriate personnel who are knowledgeable about the data in the response and the underlying account systems" be present. Cam Lam Verification Agenda at 4-5 (AD P.R. 629). Despite this, Cam Lam failed to make key personnel—namely, Mr. Sun, the sales manager who had ordered Cam Lam's raw material inputs—available during verification. IDM at 56. Nor did Cam Lam make available the original purchase orders (*i.e.*, the numbers from which Cam Lam used to track its material inputs through production) and the tracking system Cam Lam

used to link customer payments to sales invoices, as Cam Lam claimed this information was on Mr. Sun's laptop and the laptop was with Mr. Sun in China. *See* Cam Lam Verification Report at 11 (AD P.R. 724).

While Cam Lam stated that Mr. Sun's flight from China (where he resides) to Vietnam (where the verification took place) was cancelled due to severe weather, Cam Lam unilaterally determined that it was unnecessary for Mr. Sun, who possessed the laptop with the company's payment tracking system, to rebook his flight so that he could attend the verification. *Id.* at 12. And, when Commerce attempted to confirm Mr. Sun's explanation for his absence through a video conference, Mr. Sun was unable to show that he had a visa allowing him to travel to Vietnam at the time of the verification; instead claiming that his visa was in a room that he rents an hour away in order to keep his cat away from his baby. *Id.* at 11.

Plaintiffs claim that Cam Lam put forth its maximum effort to cooperate with Commerce's verification, "notwithstanding Mr. Sun's unavailability." USPLY/Vincent Woods Br. at 28. But the record makes clear that Mr. Sun, the sales manager who is responsible for raw material purchases, maintains Cam Lam's payment tracking system, and keeps crucial information on his laptop, did not attempt to rebook another flight after his first was cancelled (and indeed, could not demonstrate that he would have been allowed to travel to Vietnam). Then, other company officials determined, without first consulting with Commerce, that "the presence of the company owner, who deals with sales often would be sufficient." Cam Lam Verification Report at 11 (AD P.R. 724). Commerce explicitly requested that Cam Lam make available source documents, which in this case were only available on Mr. Sun's laptop, and directed "{a}ppropriate personnel who are knowledgeable about the data in the response and the underlying account systems" to be present so that they could explain the system used to link

customer payments to commercial invoices. *Id.*; *see also* Cam Lam Verification Agenda at 4-5. Cam Lam's failure to ensure that Mr. Sun, or at least his laptop, was present at verification constituted a serious failure to comply with Commerce's verification procedures. As such, Commerce properly determined that Cam Lam failed to act to the best of its ability.

### 2. Commerce Was Unable to Verify the Accuracy of Cam Lam's Reported Information

As described above, Commerce discovered during verification that the source versions of Cam Lam's purchase orders "were solely available on {Mr. Sun}'s laptop," and that Mr. Sun and his laptop were not even in the same country as the verification site. Cam Lam Verification Report at 10 (AD P.R. 724). While Commerce attempted to resolve the outstanding questions through a videoconference with Mr. Sun on the last day of verification, without full access to the laptop, Commerce verifiers could not "completely query his system or fully understand the scope of the records maintained on his computer" because they could only view certain requested documents through Mr. Sun's cell phone camera pointed as his laptop screen. *Id.* at 11-12 (AD P.R. 724).

Courts have held that "Commerce is entitled to insist on the original records because 'failure to submit primary source documentation' means that Commerce is 'unable to verify the accuracy of the information submitted.'" *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) (quoting *Thyssen Stahl AG v. AK Steel Corp.*, 155 F.3d 574, 1998 WL 455076, at *5 (Fed. Cir. July 27, 1998)). Here, because Cam Lam did not provide source versions of its purchase orders, Commerce could not verify the system used by Cam Lam to track its material inputs through production, as Cam Lam tracked the identity of its suppliers using the purchase order number on its raw material warehouse out slips. *See* Cam Lam Verification Report at 7, 9 (AD P.R. 724). Commerce was similarly unable to examine the

tracking system maintained solely by Mr. Sun to identify linkages of bank statement payments and commercial invoices because Mr. Sun's laptop, which contained the tracking system, was in a different country. *Id.* at 12. Because Cam Lam did not adequately explain how it determined the appropriate payment information to report to Commerce during verification, Commerce was also "unable to fully verify Cam Lam's payment documentation." IDM at 60.

Without direct access to Mr. Sun's laptop, Commerce was also "unable to fully examine Cam Lam's material input orders." IDM at 58 (citing Cam Lam Verification Report at 12 (AD P.R. 724)). Specifically, Commerce was deprived of the ability to examine "documentation related to payments, contracts maintained by its U.S. affiliated reseller, and a number of other documents" which were maintained on Mr. Sun's laptop. *Id.* at 59 (citing Cam Lam Verification Report at VE-7 (AD C.R. 868)). Given these multiple issues, Commerce reasonably found Cam Lam's reporting "incorrect and unreliable." IDM at 64.

Plaintiffs argue that Commerce successfully verified the facts needed to resolve the issue of whether Cam Lam had purchased or used Chinese core inputs, claiming that the only information not available to Commerce during verification was immaterial to this question. USPLY/Vincent Wood Br. at 8. Specifically, they contend that Commerce "confirmed Cam Lam tracked suppliers and production through purchase-order numbers" and that Commerce "specifically verified that Cam Lam did not purchase Chinese core veneers or core platforms during the {period of review}." *Id.* at 9-10, 13. But this argument assumes that the information Cam Lam reported was accurate; here, because the source document purchase orders were unavailable at verification, Commerce could not "confirm the accuracy of Cam Lam's reported information" or completely verify Cam Lam's tracking system, which relied on purchase order numbers. IDM at 62. Commerce's verification report explicitly states that it "does not draw

conclusions as to whether the reported information was successfully verified," and the only information Commerce confirmed it was able to verify was the quantity and value of the sales reported in Cam Lam's U.S. sales database. Cam Lam Verification Report at 1 (AD P.R. 724); IDM at 60. Plaintiffs' argument that Commerce could successfully verify Cam Lam's core inputs is thus incorrect.

Plaintiffs next focus their argument on a certain customer—"Customer A"—claiming that Commerce misunderstood the form and manner in which Customer A ordinarily transmits purchase orders. USPLY/Vincent Wood Br. at 14, 17. In doing so, plaintiffs fail to adequately grapple with Cam Lam's failure to make the source document purchase orders available to Commerce despite advance notice that Commerce intended to examine these source documents. Cam Lam Verification Agenda at 4-5 (AD P.R. 629). Any purported misunderstanding could have been resolved through the verification, had Cam Lam ensured that source documents, the laptop with the tracking system, and Mr. Sun were available on site during the verification.

Moreover, while the Excel spreadsheet format of Customer A's purchase orders may have initially prompted Commerce verifiers to inquire "whether this was indeed the complete purchase order from the customer," the fact remains that the purchase orders "were solely available on Cam Lam's sales manager's laptop." Cam Lam Verification Report at 11 (AD P.R. 724). As such, whether purchase orders issued by other customers conveyed the same commercial details or whether Customer A routinely issued such purchase orders to other respondents verified by Commerce, *see* USPLY/Vincent Wood Br. at 14, 16, is immaterial.

Plaintiffs also argue that Commerce's characterization of the purchase orders presented to it at verification as "manipulated versions" is unsupported by substantial evidence. USPLY/Vincent Wood Br. 17. But, as Commerce explained, Cam Lam provided "excerpts of

Excel spreadsheets," IDM at 58, and plaintiffs themselves acknowledge that "staff sometimes copied and pasted from Customer A's spreadsheet template only the purchase orders relevant to the particular shipment reflected in the corresponding sales package." USPLY/Vincent Wood Br. at 17. This process itself reveals the creation of manipulated versions derived from complete purchase orders maintained on Mr. Sun's laptop, which was not available during verification. Plaintiffs seem to believe that Commerce misunderstood its own verification report and that, rather than complete purchase orders being stored on Mr. Sun's laptop, it is only "the actual chat or email related to the purchase order table" that was solely available on his laptop. USPLY/Vincent Wood Br. at 17 (citing Cam Lam's Verification Report at 11 (AD P.R. 724)). But it is plaintiffs who misunderstand the verification report. The full passage from the verification report states:

> We also observed that the exhibit included a "purchase order." This "purchase order" was only a worksheet comprised of several rows and columns, without any other information. We asked the company to explain the context of the information in the table, and whether this was indeed the complete purchase order from the customer. Officials explained that purchase orders are typically sent as attachments to a chat in WeChat or to an email, and were solely available on Cam Lam's sales manager's laptop. We asked to see the actual chat or email related to the purchase order table provided with the sales trace documents for SEQU 12, but the company explained that the chat or email was not readily available because the sales manager, Mr. Sun was not on-site.

Cam Lam Verification Report at 11 (AD P.R. 724). As the verification report demonstrates, the best reading of Cam Lam's response to the question of whether "this was indeed the complete

purchase order" is that the purchase orders "were solely available on Cam Lam's manager's laptop."[6]

And, while plaintiffs assert that the purchase orders received by Mr. Sun were saved to Cam Lam's records then printed and maintained by Cam Lam's staff, USPLY/Vincent Woods Br. at 17, Commerce was not required to accept copies of Cam Lam's purchase orders as an authentic substitute for the originals. *See Heveafil Sdn. Bhd. v. United States*, 58 F. App'x 843, 847 (Fed. Cir. 2003). In *Heveafil*, Commerce refused "to use a diskette that Heveafil proffered as containing a copy of the BOM database to verify Heveafil's cost information." *Id.* Heveafil argued that Commerce should have accepted its copy of the database because the diskette contained an exact duplicate of the database on the company's mainframe computer, but the Federal Circuit rejected this argument, holding that "{i}n light of the deference given to Commerce to develop its own verification procedures, we conclude that Commerce acted within its discretion in rejecting" the copy of the database when the authenticity of the copy had not been established. *Id.* at 848.

Moreover, it is not clear that the copies maintained by Cam Lam constitute exact duplicates of the complete purchase orders available on Mr. Sun's laptop. Cam Lam officials only presented Commerce with printouts of excerpts of the original spreadsheets. *See* IDM at 58. While plaintiffs claim that the screenshots included in certain verification exhibits demonstrate that the purchase orders maintained on Mr. Sun's computer are exactly the same as those presented to Commerce at verification, USPLY/Vincent Woods Br. at 18 (citing Cam Lam Verification Report at Exhs. VE-9, 12, 14, 16 (AD C.R. 870-71, 874-75, 877, 880)), because

[6] Again, one can assume that the Commerce verifiers, who had listened to the explanation from Cam Lam officials, understood the contents of their own report and would have corrected any misunderstanding from the final results.

Commerce was unable to meaningfully query Mr. Sun's laptop, it could not verify that the attachments in the screenshots were an exact match. IDM at 56 (citing Cam Lam Verification Report at 11-12). In any event, not all of the pre-selected and surprise sales traces included produced screenshots. *See, e.g.*, Cam Lam Verification Report at Exhs. VE-10, VE-13, VE-15 (A.D. C.R. 872, 876, 878).

Plaintiffs further contend that Cam Lam maintained its purchase orders in its sales office and that "counsel specifically explained to the verifiers that the filing cabinets in a portion of the sales office contained Cam Lam's sales documentation and that those records were fully available for Commerce's review." USPLY/Vincent Woods Br. at 19. But plaintiffs cite no record evidence to support this assertion, and it conflicts with the statement made by Cam Lam at verification that "purchase orders . . . were *solely* available on Cam Lam's sales manager's laptop." Cam Lam Verification Report at 11 (emphasis added); *see also* IDM at 58 ("{w}hen we examined the sales trace packages, we asked for the necessary documentation, and Cam Lam stated that it was located in China"). Regardless, even if Cam Lam had maintained excerpts of its complete purchase orders in its sales office, they still would not constitute the complete set of documents requested by Commerce.

Plaintiffs next argue that because Commerce confirmed that the information reflected in Cam Lam's purchase orders corresponded to the information on its commercial invoice, Commerce successfully verified Cam Lam's ability to trace individual sales through production and raw material consumption. USPLY/Vincent Woods Br. at 20-22. They also contend that discrepancies between "Customer A's broader spreadsheet template" and the purchase orders maintained by Cam Lam do not undermine Commerce's tracing analysis because Commerce could use the purchase order number as it appears on Cam Lam's commercial invoices to track

raw materials. *Id.* at 22. But again, these arguments ignore the key fact that Commerce was "unable to fully verify Cam Lam's payment documentation." IDM at 60. As Commerce explained, "{p}ayment documentation, or records that are able to link payments with sales, could have also served as an independent third-party corroboration that the individual sales transactions recorded in the accounting system were accurate." *Id.* at 62. However, because Commerce was unable to verify the accuracy of Cam Lam's purchase orders and its payment documentation, it could not ascertain the reliability of Cam Lam's raw material input tracing methodology, which—as plaintiffs acknowledge—relies on the purchase order number and associated information appearing on its commercial invoices. USPLY/Vincent Woods Br. at 21-22.

In a similar vein, plaintiffs allege that all relevant bank and accounting records were made available to Commerce and "fully explained and justified payments for samples invoices." USPLY/Vincent Woods Br. at 24. Per plaintiffs, the only information not available to Commerce during verification was Mr. Sun's "informal notes identifying which payments corresponded to which invoices before the payments were formally recorded into Cam Lam's accounting system," and that Cam Lam's accounting department "did not require those notes to tie payments to sales transactions" because of the small size of the company. *Id.* These statements, however, are undermined by Commerce's findings in its verification report. Because Cam Lam's sales-trace exhibits did not, on their face, demonstrate how Cam Lam linked specific invoices to specific customer payments, Commerce verifiers asked how Cam Lam was able to determine that the payments related to specific sales. *See* Cam Lam Verification Report at 12. Cam Lam officials responded "that they were able to identify linkages of payments using a tracking system maintained by Mr. Sun." *Id.* Far from its accounting records being "fully explained," Cam Lam admitted that it identified linkages of payments using Mr. Sun's tracking system, which was on

Mr. Sun's laptop and unable to be probed during verification; as such, Commerce was unable to verify the tracking system that Cam Lam represented constituted their way of identifying payment linkages. IDM at 60. The Court should pay no heed to Cam Lam's *post hoc* statements that Mr. Sun did not have a "tracking system," but rather only informal notes.

Undeterred, plaintiffs claim that Commerce has—in the past and in verifications of other respondents in the underlying reviews—accepted the same type of payment breakdown charts and bank statements as payment reconciliation methodologies, and that Commerce has failed to explain why the same methodology is insufficient with regard to Cam Lam "merely because Mr. Sun was unavailable during verification." USPLY/Vincent Wood Br. at 24-26. But, unlike those other respondents, Cam Lam explicitly stated that it used a tracking system to link its customer payments to its sales and that this system was maintained by Mr. Sun on his laptop. Accordingly, Commerce could not fully verify Cam Lam's payment documentation, and Cam Lam cannot demonstrate that its situation was akin to those of other respondents for which Commerce may have accepted certain other payment reconciliation methodologies.

Commerce's inability to examine Mr. Sun's laptop, which contained crucial information, did not, as plaintiffs suggest, only concern ancillary documentation issues, but was "relevant and necessary for the purpose of verifying the accuracy of the company's reported information." IDM at 61. Once Commerce found "Cam Lam's reporting incorrect and unreliable," the other information it presented regarding its material inputs could not redeem or replace its flawed reporting; accordingly, Commerce properly applied facts available, finding that there was a gap in the record and that Cam Lam withheld requested information and provided information that could not be verified. *See Tanghenam*, 823 F. Supp. 3d at 1332 ("the statute does not require that

information is entirely absent from the record; it is sufficient that the information Commerce requires to perform its analysis is unreliable or unavailable within timeframe requested").

**2. Cam Lam Withheld Necessary Information by Failing to Disclose Its Name Change Before Verification**

Commerce also reasonably determined that it should apply AFA to Cam Lam due to the company's failure to disclose a name change it had undergone in 2023—a change Commerce only discovered at verification. Even though Cam Lam had changed its name to Vincent Wood Joint Stock Company prior to filing its questionnaire responses, the company consistently represented itself by its former name: Cam Lam Vietnam Joint Stock Company. *See* IDM at 62 (citing Cam Lam Verification Agenda at 3 (AD P.R. 629)); *see also generally* Cam Lam Q&V Questionnaire Resp. (AD P.R. 306); Cam Lam Corrected Public March CEQ Resp. (AD P.R. 578); Cam Lam Supp. CEQ Resp. (Aug. 20, 2024) (AD P.R. 607, C.R. 723-29). Indeed, for its questionnaire responses, Cam Lam officials affixed company certifications attesting to the accuracy of the information signed by its general manager, who it represented as "currently employed by Cam Lam Vietnam Joint Stock Company," even though this company no longer existed. *See, e.g.,* Cam Lam Q&V Questionnaire Resp. at 4 (AD P.R. 306).

In addition, when asked to provide "a full narrative history" by the certification eligibility questionnaire, Cam Lam provided a history beginning [redacted] and extending past the period of review, but stopping two months before its name change. *See* CEQ Resp. at 15-16 (AD C.R. 346); IDM at 63. Plaintiffs claim that Cam Lam understood Commerce's question as "directed to ownership and affiliation information relevant to the period of review," USPLY/Vincent Woods Br. at 32, but this representation is undermined by the fact that Cam Lam's history began [redacted] and ended after the period of

review. For instance, Cam Lam described its registered [redacted] [redacted], both of which occurred after the period of review had ended. Cam Lam CEQ Resp. at 16.

When Commerce queried Cam Lam at verification regarding the name change Commerce had only just discovered, the general manager's ostensible reasoning was that "the company did not like the name Cam Lam, and they believed that a new, better, name would be better for business." Cam Lam Verification Report at 3 (AD P.R. 724). But Cam Lam did not change this allegedly disliked name during the [redacted] to the period of review; interestingly, five months before the name change, Commerce had determined that Cam Lam was ineligible to participate in the certification regime. *See* Cam Lam Verification Report at Exh. VE-2 at 2 (AD P.R. 861); *see also Circumvention Final Determination* IDM at 150. Thus, while Cam Lam was precluded from certifying that its exports did not contain any merchandise produced under the five scenarios identified in the *Circumvention Final Determination*, Cam Lam may have been able to certify under the Vincet Wood name, as Commerce had not made the same finding for Vincent Wood or previously found that Vincent Wood was the successor-in-interest to Cam Lam. It was thus crucial for Cam Lam to have promptly disclosed its changed name rather than representing itself as a company that no longer existed,

While Cam Lam's general manager claimed at verification that the company had stopped exporting after changing names, this is not relevant to the fact that Cam Lam withheld its name change in its questionnaire responses, omitting the name change from its otherwise fulsome narrative history and certifying to the accuracy of those responses in the name of a non-existent entity. Moreover, Commerce is not required to accept at face value a respondent's claim as to the relevance of the information it submits or, in this case, belatedly discloses. *See Fujian*, 178 F. Supp. 2d at 1326-27. And, because Cam Lam had not previously disclosed the name change,

Commerce was unable to conduct a full successor-in-interest analysis, or even determine whether one was warranted. Commerce thus properly determined that Cam Lam had withheld crucial information, failed to report the information in the form and manner requested, and significantly impeded these reviews by failing to timely provide information necessary for Commerce to determine whether a successor-in-interest analysis was warranted. IDM at 63. Accordingly, Commerce reasonably applied facts otherwise available under to 19 U.S.C. § 1677e(a)(2)(A)-(C). *Id.* Commerce also found that Cam Lam failed to report information in its possession despite multiple opportunities to do so and, as such, properly concluded that Cam Lam had failed to act the best of its ability.

Plaintiffs argue that Commerce failed to explain how the withheld information regarding the name change was "necessary to determine whether Cam Lam's POR entries were subject merchandise or whether Cam Lam could establish certification eligibility." USPLY/Vincent Wood Br. at 30. But, as Commerce explained, it applied facts otherwise available because Cam Lam had withheld information necessary to determine whether a successor-in-interest analysis was warranted, not based on whether the entries were subject merchandise, and found as AFA that Vincent Wood was the successor-in-interest to Cam Lam. IDM at 63-64. Plaintiffs also ignore that Cam Lam's behavior in withholding its name change and mispresenting itself in its questionnaire certifications, in combination with its failures at verification, rendered Cam Lam's reporting "incorrect and unreliable." *Id.* at 64. In any event, Commerce's application of facts available "does not include an exception where a party deems information requested by Commerce to be irrelevant{;}" rather, it is the respondent's role to "'comply with such requests for information, regardless of the respondent's perception.'" *See Bridgestone Americas Tire Operations, LLC v. United States.*, --- F. Supp. 3d ----, No. 24-00263, 2026 WL 2114514, at *7

(Ct. Int'l Trade July 22, 2026) (quoting *SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2023)).

Plaintiffs also contend that Cam Lam's failure to timely disclose its name change did not significantly impede the proceeding because Commerce became aware of the name change at verification and so could have conducted a successor-in-interest analysis at that time. *See* Vincent Br. 30-31. But it is well-understood that verification is not an opportunity to submit information in the first instance; rather, the purpose of verification is to spot-check information previously submitted by a respondent. *See Hung Vuong*, 483 F. Supp. 3d at 1349. Commerce was under no obligation to conduct an *ad hoc* successor-in-interest analysis at verification and it reasonably concluded that Cam Lam's reporting was incorrect and unreliable based on its withholding of basic information as "essential and fundamental" as its own company name. IDM at 64.

Plaintiffs rely on several cases that purportedly "underscore the immateriality of the {successor-in-interest} issue." USPLY/Vincent Wood Br. at 31-33 (citing *GreenFirst Forest Prods. Inc. v. United Sates*, 647 F. Supp. 3d 1352, 1355 (Ct. Int'l Trade 2023); *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, 35 CIT 222, 233-34 (2011); *Shandong Yongtai Grp. Co. v. United States*, 414 F. Supp. 3d 1303, 1408-10 (Ct. Int'l Trade 2019)). But these cases are inapposite, as they all concern situations where the plaintiff *affirmatively sough*t a successor-in-interest determination. Here, Cam Lam failed to timely disclose its company name change and only belatedly claims that Commerce could have conducted a successor-in-interest analysis during verification. Cam Lam is simply not in the same position as the plaintiffs in the cited cases and cannot reasonably rely on the fact that it was not asked to disclose a post-period of

review name change[7] when it continuously represented and even certified itself as non-existent company and when it selectively ended its requested narrative history just before the time of the name change. IDM at 63-64. Commerce reasonably determined to apply facts available with an adverse inference to Cam Lam based on Cam Lam's behavior regarding its name change, finding as AFA that Vincent Wood was the successor-in-interest to Cam Lam and would be subject to the final results.

## III. Commerce Appropriately Found That Win Faith Was Not Entitled to a Separate Rate

Substantial evidence supports Commerce's determination that Win Faith failed to demonstrate its eligibility for a separate rate by rebutting the presumption of GOC control. Consistent with its longstanding practice and guided by regulation, Commerce reasonably rejected Win Faith's separate rate request, finding that the GOC maintains *de facto* control over Win Faith due to state-owned or controlled entities holding indirect majority ownership of Win Faith and one of Win Faith's directors holding management positions in two of Win Faith's shareholding companies, both of which are indirectly owned by state-owned enterprises.

In proceedings involving nonmarket economy countries such as China, Commerce applies a rebuttable presumption that all companies within that country are subject to government control and should be assessed a single duty rate. *See Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003); *Sigma Corp. v. United States*, 117 F.3d 1401, 1404-06 (Fed. Cir. 1997). Under this standard, a respondent receives the countrywide rate unless it can affirmatively demonstrate the absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities or functions. *See Policy Bulletin 05.1*:

[7] Commerce had no reason to suspect prior to verification that Cam Lam had undergone a name change.

*Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (2005), https://www.trade.gov/policy-bulletin-051 (Policy Bulletin 05.1).

Relevant here, Commerce will not apply a separate rate if it finds that the nonmarket economy government directly or indirectly holds a majority ownership share in the respondent company. *See* 19 C.F.R. 351.108(b)(1)(i)(A). This is because, where a government entity directly or indirectly holds a majority ownership share in the respondent, the majority ownership itself means that the government exercises, or has the potential to exercise, *de facto* control over the company's operations. *See Advanced Tech. & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012).

Here, Commerce determined that Win Faith was ineligible for a separate rate because it had not rebutted the presumption of *de facto* government control. Specifically, Commerce found that two state-owned [redacted]—along with another GOC-controlled entity [redacted] indirectly control Win Faith. IDM at 14 (citing Win Faith BPI Memo at 3 (AD C.R. 1422)). Commerce also explained that the fact that one of Win Faith's director holds a management position in Win Faith's shareholding company and one of that company's shareholding companies (both of which are indirectly owned by state-owned enterprises) supported its determination. Commerce's conclusion is clearly supported by the record and plaintiffs cannot demonstrate otherwise.

Plaintiffs argue that Commerce erred in its finding of government control, claiming that Commerce incorrectly found that government-controlled or owned entities hold indirect majority ownership of Win Faith under 19 C.F.R. § 351.108(b)(1)(i)(A) and that Commerce failed to

conduct a requisite analysis under subsection (b)(1)(i)(B) regarding the ability of Win Faith's director, who holds management positions in state-owned shareholding companies, to make or influence the company's decisions. Northwest Hardwoods/Richmond Br. at 34. But plaintiffs' argument relies on a fundamental misunderstanding of Commerce's findings.

Plaintiffs claim that Win Faith's ownership structure shows that no reasonable mind could find that the GOC had majority ownership in Win Faith under section 351.108(b)(1)(i)(A). Northwest Hardwoods/Richmond Br. at 32. According to plaintiffs, [redacted] and therefore do not have [redacted]. *Id.* at 33. While true that [redacted], plaintiffs simply assume that the [redacted] is not controlled by the GOC. Plaintiffs are plainly incorrect.

As Commerce explained and as plaintiffs do not dispute, Win Faith is wholly owned by [redacted]. *See* Win Faith BPI Memo at 3-4 (AD C.R. 1422) (citing Win Faith SRA & No Shipment Cert. at Exh. 8 (AD C.R. 97)); Win Faith Supp. SRA Questionnaire Resp. at Exh. SQ1-1 (AD C.R. 405). In turn, [redacted] of [redacted]. *Id.* at 4 (citing Win Faith Supp. SRA Questionnaire Resp. at Exh. SQ1-1). Importantly, as Commerce stated, "{l}abor unions are under the control and direction of the {ACFTU}, a government affiliated and {Chinese Communist Party (CCP)} organ" and "{a}ll trade unions are affiliates of the government controlled ACFTU and its branches at the local and enterprise level." IDM at 14 n.49 (citing

*Certain Aluminum Foil from the People's Republic of China*, 82 Fed. Reg. 50,858, 50,861 (Dep't of Commerce Nov. 2, 2017). Accordingly, [redacted] of Win Faith's [redacted] is owned by [redacted], a GOC-controlled entity, and [redacted] is owned by [redacted], which in turn is wholly owned by an entity majority owned by state-owned enterprises [redacted]. Win Faith BPI Memo at 3-4; Win Faith Supp. SRA Questionnaire Resp. at Exhibit SQ1-1; *see also* Northwest Hardwoods/Richmond Br. at 32. Collectively, this means that over [redacted] of Win Faith's [redacted] is indirectly owned by either a GOC-controlled entity or an entity that is majority owned by state-owned enterprises. This number well exceeds the threshold for finding majority ownership under 19 C.F.R. § 351.108(b)(1)(i)(A).

Plaintiffs largely ignore the crucial fact that [redacted] is a GOC-controlled entity, basing their analysis on the assumption that [redacted] is all that matters and only claiming in passing that, while Commerce referenced its presumption that all unions are government controlled in a footnote, it did not explicitly link that presumption to its findings with respect to Win Faith. Northwest Hardwoods/Richmond Br. at 35 (citing IDM at 14 n.49). But Commerce not only observed that all unions in China are government controlled, it explicitly stated that "Win Faith provided an organization chart that demonstrates that two state owned enterprises, *along with another GOC controlled entity* {emphasis added}, indirectly control Win Faith." Win Faith BPI Memo at 3. Even a cursory glance at this organization chart demonstrates that the "other GOC-controlled entity" is [redacted]. This is particularly obvious given Commerce's footnote regarding the GOC's control over labor unions, which is directly appended to the sentence finding that "government-

controlled or owned organizations hold indirect majority ownership shares in Win Faith." *See id.* at 14 n. 49.

There can be no reasonable dispute that Commerce's rationale is readily discernable. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) ("{a}n explicit explanation is not necessary, however, where the agency's decisional path is reasonably discernible"); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (a court may "uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned"). Win Faith's argument that Commerce erroneously found that it was majority-owned by government-controlled or owned entities is wholly without merit, and Commerce satisfied the requirements of 19 C.F.R. 351.108(b)(1)(i)(A).

Win Faith also complains that Commerce based its conclusion that GOC maintains *de facto* control over Win Faith on the finding that one of Win Faith's directors also holds a management position in Win Faith's parent company, which is majority owned by state-owned enterprises, but failed to conduct an adequate analysis under 19 C.F.R. § 351.108(b)(1)(i)(B) as to the effect of this director's position. Northwest Hardwoods/Richmond Br. at 34-35. But, as Win Faith acknowledges, Commerce's determination of *de facto* control was primarily based on subsection (b)(1)(i)(A), which requires no more than a finding of majority ownership. Commerce's findings regarding the director simply buttressed its overall conclusion.[8] Given that Win Faith is indirectly majority owned by GOC-controlled or owned entities, Commerce reasonably determined that the overlapping management positions of Win Faith's director

---

[8] Win Faith also improperly seeks to shift the burden of demonstrating the absence of control to Commerce. It is Win Faith, the company requesting a separate rate, who has the burden of rebutting the presumption of government control. *See Policy Bulletin 05.1*; *see also, e.g., Sigma Corp.*, 117 F.3d at 1405.

demonstrated "the further potential for influence or control" over Win Faith's business activities by the GOC." IDM at 14. This finding is consistent with subsection (b)(1)(i), which states that "other factors may indicate that the government exercises or has the potential to exercise control over an entity's general operations." Given that its determination was supported by subsection b(1)(i)(A), Commerce was not required to conduct an additional analysis under subsection (b)(1)(i)(B). Commerce's determination that Win Faith was ineligible for a separate rate was clearly supported by substantial evidence and in accordance with its regulation; the Court should not disturb it.

## IV. Commerce Did Not Abuse Its Discretion in Establishing a Certification Regime Which Requires Both Exporters and Importers to Submit Certifications

Commerce acted reasonably and within its discretion by requiring that both an exporter and importer certification be submitted to CBP in order to certify that imported merchandise was not produced under any of the five production scenarios identified in the *Circumvention Final Determination*. An abuse of discretion "occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence or represents an unreasonable judgment in weighing relevant factors." *Goodluck India Ltd. v. United States*, 670 F. Supp. 3d 1353, 1369 (Ct. Int'l Trade 2023) (quoting *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)). Here, Commerce acted in accordance with its authority, considered relevant arguments raised by the parties, and supported its determination with substantial evidence.

### A. Commerce's Certification Program Fell Within Its Authority

Commerce acted within its authority in establishing the certification program. One of Commerce's obligations is to prevent the intentional evasion or circumvention of antidumping and countervailing duties. *See Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555

(Ct. Int'l'Trade 1988), *aff'd* 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co., Ltd. v. United States*, 219 F. Supp. 2d 1333, 1343 (Ct. Int'l Trade 2002), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004). In pursuit of this goal, Congress has granted Commerce discretion has to how to conduct its circumvention proceedings, allowing Commerce to "use this authority to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws." *Macao Commercial and Industrial Spring Mattress Manufacturer v. United States*, 437 F. Supp. 3d 1324, at 1329-30 (Ct. Int'l Trade 2020) (citing S. Rep. No. 100-71, at 100 (1987) (Senate Report)).

Pursuant to the authority granted by Congress, Commerce has promulgated a regulation for the establishment of certification regimes for merchandise subject to antidumping or countervailing duty orders. *See* 19 C.F.R. § 351.228 (allowing Commerce to require that an interested party comply with certification requirements to avoid antidumping or countervailing duties). Under the regulation, Commerce "maintain{s} for itself an ongoing role in resolving issues that arise when dealing with compliance with certification requirements." *Greentech Energy Sols., Inc. v. United States*, 714 F. Supp. 3d 1315, 1330 (Ct. Int'l Trade 2024). Relevant here, Commerce may determine that a certification is deficient and unreliable and instruct CBP to liquidate the relevant entries inclusive of antidumping and/or countervailing duties. *Id*. And, as explained in the regulation's preamble, although "CBP has its own independent authority to address import documentation related to negligence, gross negligence, or fraud," the "enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of the AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority." *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,364 (Sept. 20, 2021) (*Preamble*). The

regulatory and statutory framework clearly demonstrate that Commerce acted well within its authority in establishing certification requirements, including the requirement for an exporter certification. *See* IDM at 22-23.

**B. Commerce Did Not Impinge On CBP's Authority**

Plaintiffs argue that Commerce's liquidation instructions following the reviews impinged on CBP's authority by prohibiting CBP from examining the true nature of merchandise exported by a company ineligible to participate in the certification program. Northwest Hardwoods/ Richmond Br. at 39-40. But plaintiffs misunderstand the scope of CBP's authority with regard to certifying and liquidating entries. In contrast to Commerce's "substantive role" in administering the antidumping laws, CBP "is constrained by the limitations of its ministerial role in the administration" of those laws. *Nat'l Fisheries Inst., Inc. v. United States Bureau of Customs and Border Prot.*, 637 F. Supp. 2d 1270, 1282, 1294 (Ct. Int'l Trade 2009). As the Federal Circuit has explained, CBP "cannot modify . . . {Commerce's} determinations, their underlying facts, or their enforcement," but instead has a "ministerial role in liquidating antidumping duties pursuant to the statute." *Mitsubishi*, 44 F.3d. at 977 (Fed. Cir. 1994); *see also Aireko*, 547 F. Supp. 3d at 1357.

It is true that the Enforce and Protect Act (EAPA) authorizes CBP to investigate allegations into whether merchandise subject to an order has entered the United States through evasion and determine whether these entries should be suspended or liquidated. *See* 19 U.S.C. § 1517. But EAPA is not relevant to the circumstances at hand. In situations where Commerce has issued liquidation instructions for the entries of companies deemed ineligible to participate in the certification program, it has already determined that these entries are subject to the orders. As such, the entries should already be reported as Type 3 (*i.e.*, entries subject to antidumping and/or countervailing duties) and an investigation by CBP into whether such merchandise

entered through evasion and a determination as to whether those entries should be suspended or liquidated would serve no purpose. Commerce's exercise of its authority does not impede CBP's own authority.

Commerce has recognized the balance between its own authority and CBP's. Indeed, the liquidation instructions for the underlying reviews expressly state that they do not limit CBP's independent authority:

> This instruction to liquidate entries covered by this message *does not limit CBP's independent authority*, including its authority to suspend, continue to suspend, or extend liquidation of entries addressed by this message. Accordingly, CBP should examine all entries for which this message directs liquidation to determine whether any such entries are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's independent authority (e.g., Enforce and Protect Act under section 517 of the Tariff Act of 1930, as amended). If entries of subject merchandise covered by this message are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's own authority, CBP port officials should follow CBP's internal procedures with respect to continuing any suspension, the lifting of suspension, and/or continuing any extension of liquidation for such entries.

CBP Message 5181415 (June 30, 2025) (CVD P.R. 673) (emphasis added). Plaintiffs' contention that "Commerce's instructions to CBP provided AD/CVD assessment instructions without any indication that CBP could exercise its inherent authority to conduct its own inherent analysis," Northwest Hardwoods/Richmond Br. at 37, is inaccurate and contradicted by the record.

Plaintiffs cite various cases for the proposition that an agency should not impinge on another agency's authority,[9] but these cases are inapposite and, in any event, plaintiffs demonstrate only a selective understanding of them. *See* Northwest Hardwoods/Richmond Br. at

---

[9] Notably, plaintiffs express no concern that CBP's independent authority could impinge on Commerce's authority to address circumvention, which includes the establishment of certification regimes.

40 (citing *Vanguard Trading Co. LLC v. United States*, 788 F. Supp. 3d 1277, 1290 (Ct. Int'l Trade 2025); *Blue Pipe Steel Ctr. Co., Ltd. v. United States*, 803 F. Supp. 3d 1258, 1263 (Ct. Int'l Trade 2025)). For example, plaintiffs ignore the Court's explanation in *Vanguard Trading* that "EAPA does not nor was it ever intended to limit the ability of an interested party to file separately with Commerce a request for a scope inquiry." *Vanguard Trading*, 788 F. Supp. 3d at 1291. Nor does that case discuss the issue of one agency impinging on the activity of the other; rather, it held that CBP acted lawfully in making a covered merchandise determination and not making a covered merchandise referral to Commerce. *Id.* at 1290.

Plaintiffs' reliance on *Blue Pipe Steel* fares no better. In that case, the Court rejected an argument that Commerce's scope ruling timeline should not control the timing of CBP's evasion determination, but recognized that CBP's authority under EAPA "is independent of Commerce's authority under the AD/CVD provisions of U.S. law." *Blue Pipe Steel*, 803 F. Supp. 3d at 1263 (*citing Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1349 (Ct. Int'l Trade 2021)). The relevant case law makes clear that each agency is empowered to exercise its own independent authority, which Commerce expressly recognized in the liquidation instructions. *See* CBP Message 5181415 (June 30, 2025) (CVD P.R. 673). Commerce did not abrogate CBP's authority by establishing parameters for its certification program and requiring both exporter and importer certifications.

### C. Commerce's Determination to Require Exporter Certifications Addressed Relevant Considerations and Was Supported by Substantial Evidence

In its final results, Commerce addressed party arguments regarding the certification program requirements, and its determination reflected a reasoned consideration of the relevant factors and the record. *See* IDM at 18-23. Among other things, Commerce explained that, if it were to accept the importers' request to amend the requirements of the certification program to

allow certifications from only importers, then "exporters, regardless of their failure to cooperate, would be able to export subject plywood to the United States without regard to the appropriate AD/CVD duties" and importers would be able to provide certifications based on information already deemed unreliable by Commerce, including falsified documentation. *Id*. at 23. Thus, Commerce reasonably concluded that allowing certifications from only importers would create a loophole, undermining the effectiveness of the orders. *Id*. Put another way, "to allow importer-only certifications of the entries of merchandise shipped by respondents who have been uncooperative and/or who have provided unreliable data would render Commerce's determination in the Circumvention Final Determination meaningless." *Id*.

As Commerce observed, Congress has stated that "the purpose of {the circumvention provision} of the 1930 Act is to authorize the Commerce Department to apply antidumping and countervailing duty orders in such a way as to prevent circumvention and diversion of U.S. law." IDM at 23; Senate Report at 101. In light of this purpose, certifications further serve to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order." *Preamble*, 86 FR at 52,333. As such, Commerce reasonably decided it would require verifiable information from both importers and exporters as part of its certification regime. *See* IDM at 18.

Other than alleging that Commerce impinged on CBP's authority, plaintiffs' only argument for its position that Commerce abused its discretion is that Commerce "focused on {the} incorrect assumption that importers do not have 'direct personal knowledge' of the facts regarding production of the imported plywood{.}" Northwest Hardwoods/Richmond Br. at 41. But Commerce found that, unless an importer is also the producer or exporter itself, any

information that it possesses regarding the production of hardwood plywood completed in Vietnam "would be, at best, second- or third-hand information" rather than the "direct personal knowledge" Commerce requires from exporters. IDM at 18-19. As Commerce explained, "direct personal knowledge" constitutes "facts the certifying party is expected to have in its own records." *Id*. at 19. Commerce considered the importers' argument that they can obtain and maintain certain country of origin material input production information, but determined that the information placed on the records by the importers did not contain supporting documentation demonstrating the country of origin of the core inputs. *Id.* at 20-21. Moreover, even if importers were able to submit such supporting documentation, they would still "need to obtain it from the exporters, and only the exporters themselves can attest to tis accuracy." *Id.* at 21.

Plaintiffs contend that importers possess "direct personal knowledge of facts regarding" their imports because declarations they are required to submit under the Lacey Act already ensure that importers know the country of harvest of the wood components. Northwest Hardwoods/Richmond Br. at 41 (citing 16 U.S.C. § 3372(f)(1)(C)). But Commerce addressed these types of declarations in the final results, finding that, as with the other unsupported documentation proffered by importers, the Lacey Act declarations are "completed by the importer and {are} not accompanied by any documentation to support the species or country of origin of the wood inputs reported." IDM at 21 (citing Shelter Forest Certified Plant and Product Declaration Form submitted for the U.S. Department of Agriculture Animal and Plant Health Inspection Service (APHIS)) (Aug. 14, 2023) (AD P.R. 165, C.R. 123-31; CVD P.R. 105, C.R. 27-35).

In sum, Commerce reasonably determined that importers could not, on their own, meet the requirements for certification because they could not provide verifiable source

documentation regarding the country of origin for material inputs. Commerce also explained that amending the certification program requirements would contravene the interests of compliance and the prevention of duty evasion, creating loopholes and undermining the effectiveness of the orders. Commerce acted well within its discretion in crafting a certification regime that requires certifications from both exporters and importers.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions, sustain Commerce's final results, and enter judgment for the United States.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
SAMUIL AGRANOVICH
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C., 20230

s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC, 20044
Email: Sosun.Bae@usdoj.gov

September 24, 2026

*Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chamber Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules. According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 15,985 words, excluding those exempted portions of this brief.

/s/ Sosun Bae
SOSUN BAE