**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **USPLY LLC,**<br>**Plaintiff,**<br><br>**and**<br><br>**VINCENT WOOD JOINT STOCK COMPANY, *et al.*,**<br><br>**Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br>**Defendant,**<br><br>**and**<br><br>**COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,**<br><br>**Defendant-Intervenor.** | **Before: Hon. Mark A. Barnett, Chief Judge**<br><br>**Consol. Court No. 25-00111**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Pages 13, 20-23** |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
John Allen Riggens, Esq.

**Wiley Rein LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: November 10, 2026

# TABLE OF CONTENT

Page

I. INTRODUCTION ........ 1

II. RULE 56.2 STATEMENT ........ 1

A. Administrative Decision Under Review ........ 1

B. Issues Presented ........ 2

III. STATEMENT OF FACTS ........ 2

IV. STANDARD OF REVIEW ........ 2

V. SUMMARY OF ARGUMENT ........ 3

VI. ARGUMENT ........ 4

A. Commerce's Application of AFA to Both Win Faith and Cam Lam Is Supported by the Record ........ 4

1. Statutory and Regulatory Background ........ 5

2. Commerce's Application of AFA to Win Faith Is Supported by Substantial Evidence and in Accordance with Law. ........ 7

3. Commerce's Application of AFA to Cam Lam is Supported by Substantial Evidence and in Accordance with Law ........ 15

B. Commerce's Determination that Win Faith Was Not Entitled to a Separate Rate is Supported by the Record ........ 19

C. Commerce's Certification Regime is Reasonable and Not an Abuse of Discretion ........ 23

VII. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AMS Associates, Inc. v. United States*,
719 F.3d 1376 (Fed. Cir. 2013)....7, 8

*Ansaldo Componenti, S.p.A. v. United States*,
628 F. Supp. 198 (Ct. Int'l Trade 1986)....6

*Blue Pipe Steel Ctr. Co. v. United States*,
803 F. Supp. 3d 1258 (Ct. Int'l Trade 2025)....24, 25

*Ceramica Regiomontana, S.A. v. United States*,
810 F.2d 1137 (Fed. Cir. 1987)....3

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)....2

*CP Kelco US, Inc. v. United States*,
24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014)....2

*Dongtai Peak Honey Indus. Co. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015)....2

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012)....5

*Essar Steel Ltd. v. United States*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010)....6

*Fujian Lianfu Forestry Co., Ltd. v. United States*,
638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009)....8

*Fujian Mach. and Equip. Im. & Ex. Corp v. United States*,
276 F. Supp. 2d 1371 (Ct. Int'l Trade 2003)....18

*Gov't of Argentina v. United States*,
542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021)....10

*Huayin Foreign Trade Corp. v. United States*,
322 F.3d 1369 (Fed. Cir. 2003)....19

*Hyundai Elec. & Energy Sys. Co. v. United States*,
617 F. Supp. 3d 1253 (Ct. Int'l Trade 2023)....18

*I.N.S. v. Elias-Zacarias*,
502 U.S. 478 (1992)....................3

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984)....................2, 3

*Mitsubishi Electronics America, Inc. v. United States*,
44 F.3d 973 (Fed. Cir. 1994)....................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................3, 22

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)....................5, 6

*NMB Sing. Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009)....................22

*Pastificio Gentile S.r.l. v. United States*,
798 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ....................8

*Qingdao Taifa Group Co. v. United States*,
637 F. Supp. 2d 1231 ....................14

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)....................5

*Rimco, Inc. v. United States*,
582 F. Supp. 3d 1313 (Ct. Int'l Trade 2022), *aff'd Rimco Inc. v. United States*,
98 F.4th 1046 (Fed. Cir. 2024) ....................23

*Shandong Huarong Mach. Co. v. United States*,
435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ....................14

*Shenzhen Xinboda Indus. Co. v. United States*,
180 F. Supp. 3d 1305 (Ct. Int'l Trade 2016) ....................14

*Universal Camera Corp. v. N.L.R.B.*,
340 U.S. 474 (1951)....................2

*Vanguard Trading Co. LLC v. United States*,
788 F. Supp. 3d 1277 (Ct. Int'l Trade 2025) ....................24

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................2

19 U.S.C. § 1517....................24

19 U.S.C. § 1517(b)(4)(A) .....24

19 U.S.C. § 1677e(a) .....5

19 U.S.C § 1677e(b)(1) .....5, 14

19 U.S.C. § 1677m(e)(2) .....8

**Regulations**

19 C.F.R. § 351.108 .....19

19 C.F.R. § 351.108(b) .....20

19 C.F.R. § 351.108(b)(1)(i)(A) .....22

19 C.F.R. § 351.108(b)(1)(i)(B) .....22

19 C.F.R. § 351.108(b)(1)(A) .....21

**Administrative Materials**

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) .....7

*Certain Hardwood Plywood Products From the People's Republic of China*, 90 Fed. Reg. 21,271 (Dep't Commerce May 19, 2025) .....1

*Certain Oil Country Tubular Goods from the People's Republic of China*, 78 Fed. Reg. 49,475 (Dep't Commerce Aug. 14, 2013) .....6

*Certain Steel Grating from the People's Republic of China*, 75 Fed. Reg. 32,366 (Dep't Commerce June 8, 2010) .....9

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China*, 84 Fed. Reg. 32,723 (Dep't Commerce July 9, 2019) .....6

*Drawn Stainless Steel Sinks From the People's Republic of China*, 88 Fed. Reg. 76,174 (Dep't Commerce Nov. 6, 2023) .....6

*Fresh Garlic from the People's Republic of China*, 68 Fed. Reg. 68,868 (Dep't Commerce Dec. 10, 2003) .....9

*Galvanized Steel Wire From the People's Republic of China*, 77 Fed. Reg. 17,418 (Dep't Commerce Mar. 26, 2012) .....7

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ......................................5, 6

# I. INTRODUCTION

On behalf of the Coalition for Fair Trade in Hardwood Plywood ("the Coalition"), we respectfully submit the following response to the motions for judgment on the agency record filed by plaintiff USPLY LLC and consolidated plaintiffs Vincent Wood Joint Stock Company ("Vincent Wood"),[1] Northwood Hardwoods, Inc. and Richmond International Forest Products, LLC. *See* Mem. of P&A in Supp. of Rule 56.2 Mot. for J. on the Agency R. of Consol. Pls.' Northwest Hardwoods, Inc. and Richmond Int'l Forest Prods. LLC (May 11, 2026), ECF No. 50 ("Consol. Pls.' Br."); Pl. USPLY LLC's and Consolidated Pl. Vincent Wood Joint Stock Company's Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R. (May 11, 2026), ECF No. 52 ("Pl.'s Br.").

# II. RULE 56.2 STATEMENT

## A. Administrative Decision Under Review

This action arises from the U.S. Department of Commerce's ("Commerce") final affirmative determination in the antidumping and countervailing duty administrative reviews of the orders on *Hardwood Plywood from the People's Republic of China* ("*Hardwood Plywood from China*"). Commerce published the final determination on May 19, 2025. *Certain Hardwood Plywood Products From the People's Republic of China*, 90 Fed. Reg. 21,271 (Dep't Commerce May 19, 2025) (final results of admin. revs. of the antidumping and countervailing duty orders, final deter. of no shipments; 2021-2022), P.R. 783, and accompanying Issues and Decision Memoranda ("IDM"), P.R. 781.[2] The period of review was September 26, 2021, through December 31, 2022.

---

[1] Vincent Wood was formally known as Cam Lam Vietnam Joint Stock Company ("Cam Lam").

[2] All citations are made to the record of the antidumping administrative review unless otherwise noted, given that many of the referenced documents were concurrently filed in both the antidumping and countervailing duty administrative reviews that are subject to these appeals.

### B. Issues Presented

Defendant-Intervenor incorporates by reference the issues presented in Defendant's Response to Plaintiffs' Motions for Judgment on the Agency Record (Sep. 24, 2026) at 2-3, ECF No. 61 ("Def.'s Resp.").

## III. STATEMENT OF FACTS

Defendant-Intervenor incorporates by reference the Statement of Facts presented in Defendant's Response. *See id.* at 3-13.

## IV. STANDARD OF REVIEW

The U.S. Court of International Trade reviews Commerce's determinations in antidumping and countervailing duty proceedings to determine whether those determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). The courts have framed the substantial evidence standard as a review for "reasonableness," in which "{the} court's function is merely to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion.'" *CP Kelco US, Inc. v. United*

---

Citations to the public record are denoted as "P.R." and citations to the confidential record are denoted as "C.R." *See* ECF No. 34-4 and 34-5.

*States*, 24 F. Supp. 3d 1337, 1344 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

The court does not re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec.*, 750 F.2d at 933. Rather, factual findings by Commerce are afforded considerable deference. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

## V. <u>SUMMARY OF ARGUMENT</u>

Commerce's *Final Determination* is supported by substantial evidence, and the Court should sustain it. First, substantial evidence supports Commerce's application of adverse facts available ("AFA") to Win Faith. Not only did Win Faith refuse to participate in verification, but it also failed to provide any response to a post-preliminary supplemental certification eligibility questionnaire. Failure to respond to these supplemental questions and participate in verification resulted in a gap in the record, necessitating the use of facts available. And given Win Faith's clear failure to cooperate to the best of its ability in this proceeding, Commerce's application of adverse inferences is supported by substantial evidence.

Second, Commerce's determination to apply AFA to Cam Lam is supported by substantial evidence. Cam Lam failed to make available the sales manager in charge of ordering Cam Lam's

raw materials and maintaining payment and source documents for purchase orders. Cam Lam's manager also had the laptop that contained the only original sources relating to purchases of raw materials and purchase orders from U.S. customers. Because neither the sales manager nor the laptop were at verification, Commerce was unable to verify that Cam Lam could track its raw material inputs through the production process. Further, Commerce discovered at verification that Cam Lam had withheld the fact that it had changed its name, representing itself as Cam Lam throughout the proceeding. Given Cam Lam's failure to provide the information necessary to successfully verify its raw material purchases and failure to report its name change to Commerce, the agency's finding that Cam Lam had significantly impeded the proceeding and did not act to the best of its ability was fully supported by the record.

Third, Commerce's determination that Win Faith had failed to rebut the presumption of *de facto* government control is also supported by substantial evidence. The record shows that Win Faith is indirectly controlled by two state-owned enterprises and another entity controlled by the Government of China ("GOC").

Finally, Commerce did not abuse its discretion in by requiring both exporters and importers to certify that imported merchandise is not subject to the antidumping and countervailing duty orders on *Hardwood Plywood from China*. Commerce acted lawfully in implementing the certification process and did not impinge on the authority of U.S. Customs and Border Protection ("CBP").

## VI. <u>ARGUMENT</u>

### A. <u>Commerce's Application of AFA to Both Win Faith and Cam Lam Is Supported by the Record</u>

Contrary to Plaintiff's and Consolidated Plaintiffs' claims, Commerce correctly applied AFA to both Win Faith and Cam Lam. Both companies failed to cooperate to the best of their

ability and their failures to provide information during the course of the proceeding and at verification resulted in significant gaps in the record.

**1. Statutory and Regulatory Background**

The Tariff Act of 1930, *as amended*, requires Commerce to rely on facts otherwise available when necessary information is not on the record or a respondent (1) withholds information requested by the agency; (2) fails to provide information in a timely manner or in the form requested; (3) significantly impedes a proceeding; or (4) provides information that cannot be verified. 19 U.S.C. § 1677e(a). In relying on the facts available, Commerce "may use an inference that is adverse to the interests" of the party providing deficient information if the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1).

Commerce's ability to apply AFA is critical to its ability to effectively administer the antidumping and countervailing duty laws. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 868 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("SAA") (describing AFA as "an essential investigative tool in antidumping and countervailing duty proceedings"). Accordingly, the "best of its ability" standard "assumes that {respondents} are familiar with the rules and regulations" and "does {not} require findings of motivation or intent." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003). Rather, Commerce must only find that (i) "a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules,

and regulations"; and (ii) that the respondent under investigation has failed to cooperate by either "failing to keep and maintain all required records, or . . . failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id.*

Commerce has discretion to apply adverse inferences to a party "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully" and should consider "the extent to which a party may benefit from its own lack of cooperation." SAA at 870, 1994 U.S.C.C.A.N. at 4199. Critically, as Commerce has repeatedly emphasized, and the courts have confirmed, Commerce, and not the respondents, determines what information is relevant and necessary, and must be provided. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the People's Republic of China*, 78 Fed. Reg. 49,475 (Dep't Commerce Aug. 14, 2013) (final results of countervailing duty admin. rev.; 2011) at 40; *Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198, 205 (Ct. Int'l Trade 1986) ("It is Commerce, not the respondent, that determines what information is to be provided . . . "); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1298-99 (Ct. Int'l Trade 2010) ("Commerce, and not {respondents}, is charged with conducting administrative reviews and weighing all evidence in its calculation of a countervailing duty margin."). Where information is missing from the record based on a respondent's failure to cooperate to the best of its ability—including its failure to submit timely information requested by Commerce—applying AFA is appropriate. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China*, 84 Fed. Reg. 32,723 (Dep't Commerce July 9, 2019) (final affirmative countervailing duty deter. and final affirmative deter. of critical circumstances) at 8. It is Commerce's practice to apply AFA to respondents that refuse to participate in verification. *See, e.g.*, Issues and Decision Memorandum accompanying *Drawn*

*Stainless Steel Sinks From the People's Republic of China*, 88 Fed. Reg. 76,174 (Dep't Commerce Nov. 6, 2023) (final results of antidumping duty admin. rev.; 2021-2022) at cmt. 6 ("*Stainless Steel Sinks from China* IDM"); Issues and Decision Memorandum accompanying *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) (final scope deter. and final affirmative deters. of circumvention with respect to Cambodia, Malaysia, Thailand, and Vietnam) at cmt. 9 (applying AFA to company that Commerce preliminarily found not to be circumventing orders for refusing to participate in verification) ("*Solar Cells from China* IDM"); Issues and Decision Memorandum accompanying *Galvanized Steel Wire From the People's Republic of China*, 77 Fed. Reg. 17,418 (Dep't Commerce Mar. 26, 2012) (final affirmative countervailing duty deter.) at cmt. 12 ("*Steel Wire from China* IDM").

### 2. Commerce's Application of AFA to Win Faith Is Supported by Substantial Evidence and in Accordance with Law.

Despite Consolidated Plaintiffs' claims to the contrary, both Win Faith's refusal to participate in verification and its failure to respond to Commerce's supplemental questionnaire independently created gaps in the record justifying application of total AFA.

#### *a. Commerce's Application of AFA to Win Faith for Refusing to Participate in Verification Is Supported by Substantial Evidence*

It is well established that Commerce is authorized to apply total AFA where a respondent refuses to be verified. *Stainless Steel Sinks from China* IDM at cmt. 6; *Solar Cells from China* IDM at cmt 9; *Steel Wire from China* IDM at cmt. 12. As Defendant correctly explained, even if a respondent places information on the record, Commerce may disregard that information if the information cannot be verified. Def.'s Resp. at 17; *see also AMS Associates, Inc. v. United States*,

719 F.3d 1376, 1380 (Fed. Cir. 2013) ("In disregarding information that it could not verify, Commerce did not act contrary to law.").[3]

Consolidated Plaintiffs nonetheless claim that Commerce must rely on Win Faith's unverified responses and conclude that the company did not export hardwood plywood manufactured under one of the five scenarios found to be circumventing the antidumping and countervailing duty orders. Consol. Pls.' Br. at 20-26. Consolidated Plaintiffs cite to no authority for the proposition that Commerce is required to rely on unverified information in making its determination. Nor could they. As Defendant correctly noted, Commerce is only required to consider information submitted by an interested party if, *inter alia*, "the information can be verified." Def.'s Resp. at 17; 19 U.S.C. § 1677m(e)(2).

Indeed, Consolidated Plaintiffs' position undermines the very purpose of verification. If respondents were able to provide favorable responses to Commerce's questionnaires, such that they received favorable preliminary determinations, and then refuse to have those responses verified or participate further in the proceedings, it would effectively neutralize the agency's ability to ensure the accuracy of the information relied on for final determinations. Indeed, it is commonplace for Commerce to discover at verification that respondents have provided incorrect or incomplete information. *See, e.g.*, *Pastificio Gentile S.r.l. v. United States*, 798 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) (upholding Commerce's application of total AFA where Commerce terminated verification after finding respondent had failed to report two affiliates); *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1340 (Ct. Int'l Trade 2009) (upholding

[3] While Defendant-Intervenor acknowledges that *AMS Associates* involved a case in which respondent withdrew from the proceeding and removed its confidential information from the record, *see* 719 F.3d at 1378, the U.S. Court of Appeals for the Federal Circuit's ruling is relevant here. By refusing to be verified, Win Faith created a situation in which the information it submitted could not be verified.

Commerce's use of AFA where Commerce found at verification that respondent had "misled" the agency by incorrectly reporting its factors of production); Issues and Decision Memorandum accompanying *Certain Steel Grating from the People's Republic of China*, 75 Fed. Reg. 32,366 (Dep't Commerce June 8, 2010) (final deter. of sales at less than fair value) at cmt. 3 (finding that respondent provided incorrect information about use of certain inputs at verification and had falsified documents); *Fresh Garlic from the People's Republic of China*, 68 Fed. Reg. 68,868, 68,871 (Dep't Commerce Dec. 10, 2003) (prelim. results of antidumping duty admin rev. and new shipper revs.) (finding respondent did not provide correct and throughout responses before, during, and following verification). Indeed, in this proceeding, Commerce applied AFA to parties that had preliminarily been found to be eligible for the certification process, but were found to have provided information that could not be verified or had been falsified. *See* IDM at 19, 28, 56. As Commerce noted, simply certifying responses is "not a valid substitute for verification itself which serves to verify the accuracy of information submitted to Commerce." *Id.* at 30 & n.119.

Consolidated Plaintiffs first argue that Commerce's determination is not supported by substantial evidence because it ignored tracing documents from its largest suppliers, including wood origin documents it alleges establish that it was not exporting hardwood plywood produced under scenarios found to be circumventing the orders. Consol. Pls.' Br. at 20-22. First and foremost, given that Win Faith refused to participate in verification, these documents could not be relied on. Moreover, the documents that Win Faith supplied related to only 26 percent of the suppliers in Win Faith's database. IDM at 30. Further, one of those suppliers refused to participate in the proceeding and, for all other suppliers, but one, Win Faith's refusal to verify meant that

Commerce was unable to confirm that Win Faith did not purchase plywood with core veneer inputs from China from those suppliers. *Id.*[4]

Consolidated Plaintiffs also suggest that Commerce's application of AFA is flawed because the agency found that two of Win Faith's suppliers did not use Win Faith as a reseller of non-circumventing merchandise and, thus, "Commerce was able to confirm the accuracy of Win Faith's reporting that it shipped non-circumventing merchandise." Consol. Pls.' Br. at 23. The record, however, demonstrates that Win Faith also exported subject merchandise produced by other suppliers. *See, e.g.*, IDM at 32; Letter from DeKieffer & Horgan, PLLC to Sec'y Commerce, re: *Win Faith Response to Certification Eligibility Questionnaire* (Mar. 28, 2024) at Exhibit 1, C.R. 353-57, P.R. 410 ("Win Faith Certification QR"). That two of Win Faith's suppliers were verified to not be circumventing the orders does not establish or verify that Win Faith's *other suppliers* were not producing hardwood plywood subject to the orders.

Further supporting Commerce's determination to apply AFA to Win Faith is the fact that it reported reselling subject merchandise produced by "Supplier C." *See* IDM at 32. However, Supplier C, which was also independently verified, did not report any sales to the United States via Win Faith. *Id.* In other words, there were contradictions in the record with respect to Win Faith's U.S. sales record based on what it reported and what its suppliers reported. This highlights

[4] It is of no moment that Commerce found Win Faith's sales trace documents "particularly probative" of determining that it had not exported circumventing merchandise in the preliminary determination. *See* Consol. Pls.' Br. at 21. The preliminary determination was made prior to verification and Commerce's determination could be based only on what parties had placed on the record at that time. In other words, at that time, there was no gap in the record. Win Faith's refusal to have these documents verified (along with its wholesale failure to respond to a supplemental questionnaire) is what created a gap in the record justifying AFA. Further, it is well established that "Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and 'its decision is supported by substantial evidence and in accordance with law.") *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) (internal quotations omitted).

exactly why it is appropriate to apply AFA to companies that refuse to be verified—without the ability to verify responses, Commerce is unable to confirm the completeness and accuracy of a respondent's reporting. For example, without being able to verify Win Faith's responses, it is unable to determine if the alleged sales of hardwood plywood produced by Supplier C were actually produced by Supplier C, or if they were produced by some other supplier whose identity Win Faith withheld.

Consolidated Plaintiffs contend that Commerce improperly refused to rely on Win Faith's responses where it accepted similar information from other respondents, namely input traces provided by Arrow Forest International Co., Ltd. *See* Consol. Pls.' Br. at 23-24. But Consolidated Plaintiffs miss the forest for the trees. The reason that Commerce relied on these documents for other producers is precisely *because they were verified*. IDM at 40. In other words, Commerce's did not "treat{} similar situations differently" as Consolidated Plaintiffs claim. *See* Consol. Pls.' Br. at 23.

Finally, Consolidated Plaintiffs argue that Commerce unlawfully did not use information submitted by importers of Win Faith's shipments to corroborate its unverified responses. *Id*. at 24-25. Specifically, Consolidated Plaintiffs contend that the supplier audit reports submitted by Northwest Hardwoods independently establishes that Win Faith's unverified responses were accurate and true. *See id*. at 24-25. Commerce, however, explained that the supplier audit reports were merely "checklists without any supporting information," IDM at 20, and "{u}ltimately {did} not contain any supporting documentation regarding the reported country of origin of the core veneer inputs used to produce the plywood imported" from Win Faith. *Id*. at 21. A review of these supplier audit reports confirms Commerce's determination. Nowhere do these supplier audit reports confirm the country of origin of the hardwood plywood produced by Win Faith's suppliers.

*See* Letter from Mowry & Grimson, PLLC to Sec'y Commerce, re: *Submission of Clarifying Factual Information* (Apr. 18, 2024) at Exhibit 1, C.R. 378, P.R. 431. Furthermore, even if the supplier audit reports were able to confirm that certain of Win Faith's suppliers did not produce circumventing merchandise, audit reports were provided only for select suppliers and, thus, there is still a gap in the record with respect to Win Faith's other suppliers. *Compare id. with* Win Faith Certification QR at Exhibit 1.

In sum, Win Faith's refusal to be verified is clear evidence of a failure to cooperate to the best of its ability and, accordingly, Commerce's determination to apply AFA with respect to Win Faith is supported by substantial evidence.

***b. Win Faith's Failure to Respond to Commerce's Supplemental Questionnaire Also Warrants Application of Total AFA***

In addition to its refusal to be verified, Win Faith's failure to respond to Commerce's second supplemental questionnaire resulted in the respondent withholding information that had been requested and left a gap in the record, warranting application of AFA. Consolidated Plaintiffs aver that Win Faith's failure to respond to this questionnaire did not create a gap in the record because the questionnaire did not request information regarding Win Faith's ability to track the origin of the hardwood plywood it exported during the POR. Consol. Pls.' Br. at 26. To the contrary, Commerce's second supplemental questionnaire requested information that was significant in determining whether Win Faith was eligible for the certification process.

Commerce requested that Win Faith provide an updated sales database to fix various fields including sales invoice date, face and back surface coatings, and various other discrepancies Commerce had noted, including a discrepancy in the reported quantity and value information. *See* Letter from Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, to Win Faith Trading Limited, re: *Administrative Review of the Antidumping Duty Order on Certain Hardwood*

*Plywood Products from the People's Republic of China: Supplemental Certification Eligibility Questionnaire – Win Faith Trading Limited* (Sep. 5, 2024) at 1-3 ("Win Faith Supplemental Certification QR"), C.R. 797, P.R. 639. These discrepancies were not minor in nature—in particular, Commerce asked Win Faith to explain an over [ ] in its reported [ ] entries during the POR. *Id.* at 3. In addition, Commerce requested additional information about Win Faith's organizational chart, its financial statements, whether Win Faith sold through resellers, and whether Win Faith was a trading company or also produced merchandise. Win Faith Supplemental Certification QR at 3-7.

As Commerce found, the requested information was highly relevant to its determination and were not irrelevant to the question of whether Win Faith was circumventing the orders. Specifically, Commerce noted that certain information in Win Faith's chart of accounts "cast doubt on Win Faith's claim that it is merely a trading company with no production activity." IDM at 30. By failing to respond to Commerce's supplemental question asking for Win Faith to clarify the nature of certain accounts in its chart of accounts, *see* Win Faith Supplemental Certification QR at 7, the record lacks clarity as to whether Win Faith was only a trading company, or whether it also produced subject merchandise during the POR. As Commerce explained, the lack of response left "open the possibility that Win Faith had unreported plywood production – using unreported Chinese-origin core inputs." IDM at 30.

Defendant-Intervenor incorporates by reference the responses of Defendant. *See* Def.'s Resp. at 22-27. Defendant has detailed in depth the shortcomings in Consolidated Plaintiff's contention that failing to respond to an entire supplemental questionnaire created a gap in the record and Consolidated Plaintiff's mischaracterization of the nature of the questions in this supplemental questionnaire.

Defendant-Intervenor highlights, however, that Commerce's determination to apply AFA was supported by *both* Win Faith's failure to respond to the second supplemental questionnaire *and* its refusal to be verified. Even to the extent that the questions in the second supplemental certification questionnaire were not relevant to a determination of whether Win Faith had exported circumventing merchandise, the record still fully supports Commerce's application of AFA due to Win Faith's refusal to participate in verification.

In relying on the facts available, Commerce "may use an inference that is adverse to the interests" of the party providing deficient information if the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C § 1677e(b)(1). There can be no doubt that in failing to respond to an entire supplemental questionnaire and refusing to participate in verification, Win Faith "failed to cooperate by not acting to the best of its ability to comply with a request for information." The court has upheld Commerce's application of total AFA in cases where respondents have failed to provide only portions of requested information and failed to substantiate export volume, as Win Faith failed to do here, *see Shenzhen Xinboda Indus. Co. v. United States*, 180 F. Supp. 3d 1305, 1313-15 (Ct. Int'l Trade 2016), and where respondents have failed to provide all requested information, *see, e.g., Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1238-40 (sustaining Commerce's application of AFA where respondent failed to provide information about a single factor of production and failed to provide requested production documentation at verification); *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1270-73 (Ct. Int'l Trade 2006) (applying total AFA to respondents for failing to report sales of merchandise it did not consider to be subject merchandise). Application of total AFA has even further support in the record here where, unlike in the cited cases, Win Faith also refused to be verified.

### 3. Commerce's Application of AFA to Cam Lam is Supported by Substantial Evidence and in Accordance with Law

Cam Lam likewise challenges Commerce's application of AFA based on verification deficiencies. Pl.'s Br. at 7-33. Specifically, Cam Lam avers that (1) Commerce successfully verified that it did not purchase or use Chinese core materials in its exported merchandise, *id*. at 7-13; (2) Commerce's finding that certain purchase orders were manipulated is not supported by substantial evidence, *id*. at 8-23; (3) Commerce's finding that it was unable to verify Cam Lam's U.S. customer payments is inconsistent with the agency's verification practice, *id*. at 23-29; and (4) Commerce's reliance on Cam Lam's undisclosed name change to apply AFA is not supported by substantial evidence, *id*. at 29-33. For the reasons discussed below, these arguments necessarily fail.

#### ***a. Commerce Correctly Found that Personnel and Information Necessary to Conduct Verification Were Not Available at Verification***

As Defendant has correctly noted, it is axiomatic that Commerce has broad discretion in how it conducts verification. *See* Def.'s Resp. at 27. Consistent with Commerce's discretion to conduct verification, Commerce regularly requests information in advance of verification that it intends to review. *See, e.g.*, Letter from Kabir Archuletta to Cam Lam Vietnam Joint Stock Company, re: *Verification of the Questionnaire Responses of Cam Lam Vietnam Joint Stock Company* (Aug. 30, 2024) ("Cam Lam Verification Agenda"), C.R. 768, P.R. 629. In its verification agenda, Commerce explained that Cam Lam needed to prepare sales-trace packages for certain of its sales and that each packet should include purchase orders, payment documentation, sales contracts, and other documents associated with each sale. *Id*. at 9.

However, as Commerce found at verification, Cam Lam's sales manager, Mr. Sun, was not present, and his laptop contained the only copies of numerous documents Commerce intended to

verify, including "purchase orders, payment documentation to support customer payments, sales contracts with Cam Lam's affiliated U.S. reseller, and a number of other documents . . . related to Cam Lam's U.S. reseller." IDM at 56. And, when Commerce obliged and allowed Mr. Sun to share these documents via a videoconference, Mr. Sun did not have a web camera or any standard video conference equipment, instead turning his cell phone camera towards the screen. The limitations of this set up, however, made it so that Commerce was "unable to completely query his system or fully understand the scope of the records maintained on his computer." *Id.* In other words, Commerce was unable to verify an extensive amount of information due to Mr. Sun's absence because his laptop was the only source of this information.

Cam Lam claims that even without the information on the laptop, Commerce successfully verified Cam Lam's purchase of and payments for raw materials. *See* Pl.'s Br. at 9-11. Contrary to Cam Lam's claims, this was not the case. As Commerce explained, Mr. Sun's (and his laptop's) absence from verification was of particular importance given that he was "responsible for determining Cam Lam's raw material needs" and "ordered the raw material inputs." IDM at 58 (quoting Cam Lam Verification Agenda at 8). Because Commerce was unable to adequately query Mr. Sun's laptop, Commerce explained that it was "unable to fully examine Cam Lam's material input orders." *Id.* In other words, Commerce was unable to confirm the accuracy of the documents provided at verification because they were not able to review the source materials, all of which were on Mr. Sun's laptop.

Indeed, Cam Lam's next challenge illustrates the necessity of having source materials at verification, and why, without these documents, Commerce was unable to confirm that a respondents' sale is traceable. Cam Lam challenges Commerce's determination that purchase orders from "Customer A" are "manipulated versions of those purported documents." *Id.*; *see* Pl.'s

Br. at 14-23. Specifically, as part of its sales trace for sales to "Customer A," Cam Lam provided an Excel worksheet purported to be a purchase order. Cam Lam Verification Report at 11. As Cam Lam concedes, the use of an Excel worksheet as a purchase order differs from its other purchase orders, *see* Pl.'s Br. at 15 (noting that other purchase orders were "in a conventional purchase-order layout"). Given the unusual nature of Customer A's purchase orders, Commerce needed the original source documents to verify Cam Lam's contention that this was indeed how Customer A issued purchase orders. *See* Cam Lam Verification Report at 11. However, the only place in which the original source documents were located was on Mr. Sun's laptop, which Commerce was unable to successfully query given Mr. Sun's absence from verification.

As Commerce detailed, the inability to review source materials located on Mr. Sun's laptop resulted in significant verification failures. Beyond the general requirements that respondent have all verification documents prepared in advance and have the appropriate personnel knowledgeable about the data systems and records, *see* IDM at 57, Commerce was unable to verify Cam Lam's (1) records for raw material purchases, (2) purchase orders for Cam Lam's sales traces, and (3) payment records for U.S. sales, including bank statements, lockbox statements, and customer payment notifications. *Id.* at 58-59. That is, Commerce was unable to verify both sides of the sales trace—it was unable to verify the raw materials that were used in merchandise that Cam Lam exported to the United States and it was unable to verify documentation of that merchandise being sold in the United States. The inability to do so was particularly noteworthy here, given that the purpose of this verification was to confirm that (1) Cam Lam's merchandise was not being made with certain Chinese inputs and (2) Cam Lam was not exporting any merchandise made with certain Chinese inputs to the United States. *See Id.* at 60-63. As Commerce explained, "without complete purchase orders, {it} is unable to confirm the linkage between the sale and production

documentation" and "this linkage is paramount for Commerce to confirm the company can reasonably track its material inputs through the production to the sale of the merchandise." *Id.* at 60-61.

Given the necessity of reviewing all of the documents in the sales trace—raw material purchase records, purchase orders, and payment records—failure to provide any of these documents would fully support the application of AFA. As Commerce explained, "any one of these significant errors, in isolation, may have well led Commerce to conclude that some or all of Cam Lam's data was not verifiable or unreliable. However, when these errors are viewed in combination, that conclusion becomes inescapable." *Id.* at 63-64. Given Cam Lam's failure to provide multiple documents necessary to verify that the company could track its material inputs through production to sale in the United States, Commerce was justified in finding that Cam Lam failed to cooperate to the best of its ability. As such, Commerce's application of AFA is supported by substantial evidence. *See, e.g.*, *Hyundai Elec. & Energy Sys. Co. v. United States*, 617 F. Supp. 3d 1253, 1259-62 (Ct. Int'l Trade 2023) (upholding Commerce's use of total AFA based on multiple instances of verification failures by respondent); *Fujian Mach. and Equip. Im. & Ex. Corp v. United States*, 276 F. Supp. 2d 1371, 1374 n.2 (Ct. Int'l Trade 2003) (explaining that "numerous oversights would likely suggest a pattern of unresponsiveness justifying not only the application of facts available, but of AFA") (internal quotations and citations omitted).

#### ***b. Cam Lam's Failure to Notify Commerce of its Name Change Until Verification Further Supports Commerce's Application of AFA***

Commerce reasonably determined that the application of AFA to Cam Lam was further warranted because of its failure to disclose that it had changed its name to Vincent Wood. *See* IDM at 62-63. Cam Lam claims that the name change is not relevant to the POR because it took place after the end of the POR and, thus, "all POR production, sales, and exports at issue were made

under the Cam Lam name," and that Commerce was able to review its updated business license. Pl.'s Br. at 30.

Commerce explained that its discovery of the fact that Cam Lam had changed its name to Vincent Wood necessitated a successor-in-interest analysis to determine that Vincent Wood was entitled to use the certification process as the successor-in-interest to Cam Lam. IDM at 62-63. However, because Cam Lam had not notified Commerce of the name change, it did not have the information necessary to conduct a successor-in-interest analysis. *Id.* at 63. As such, Commerce reasonably determined that Cam Lam's failure to report this information significantly impeded the review because Commerce was unable to determine (and other interested parties were unable to comment on) whether a successor-in-interest analysis was warranted. *See id.*

Moreover, Cam Lam's omission of information regarding its name change is yet another instance in which the company failed to cooperate to the best of its ability in complying with Commerce's requests for information. As Commerce explained, this omission, coupled with Cam Lam's failure to provide necessary documentation of its purchases and sales at verification led the agency to the "inescapable" conclusion that Cam Lam's responses were not verifiable or unreliable. *Id.* at 63-64. As such, Commerce's AFA determination was supported by substantial evidence.

### B. **Commerce's Determination that Win Faith Was Not Entitled to a Separate Rate is Supported by the Record**

Commerce reasonably found that Win Faith was not entitled to a separate rate and that the GOC maintains *de facto* control over Win Faith. In non-market economy country proceedings, Commerce applies a rebuttable presumption that all companies within that country are subject to government control. *See* 19 C.F.R. § 351.108; *Huayin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003). An exporter may apply for a "separate rate," by demonstrating

that it "operates certain activities sufficiently independent from nonmarket economy government control to justify the application of a separate rate." 19 C.F.R. § 351.108(b). However, Commerce will not apply a separate rate to a company where the non-market economy government holds: (A) a majority ownership share (over fifty percent ownership) of that company or (b) an ownership interest in the entity of fifty percent or less and any one of a number of criteria apply, including that "officials, employees, government-appointed or government-controlled labor union members, representatives of the government, or their family members have been appointed as officers or manager of the entity, members of the board of directors, or other governing authorities in the entity that have the ability to make or influence production, commercial and export decisions" for the company. *Id.* § 351.108(b)(1)(i)(A)-(B).

Here, the record plainly establishes that the GOC exercises *de facto* control over Win Faith. As all parties agree, Win Faith is [ ] percent owned by [ ], which is in turn [ ]. *See* Consol. Pls.' Br. at 32; Memorandum from Rachel Jennings to Kabir Archuletta, re: *Business Proprietary Memorandum for the Final Results* (May 12, 2025) at 3-4 ("BPI IDM"), C.R. 1422, P.R. 782. [ ]. *Id.* at 4; *see also* Consol. Pls.' Br. at 32-33. In sum, Win Faith's controlling company is owned by [ ]. As Commerce explained, [

].

Consolidated Plaintiffs seek a remand by arguing form over substance. Consolidated Plaintiffs highlight that Commerce explained that it was finding *de facto* government control only under 19 C.F.R. § 351.108(b)(1)(A), seemingly arguing that Commerce has not explained how Win Faith is majority owned by the Chinese government and insinuating that [ ] is not government-controlled. *See* Consol. Pls.' Br. at 33-34. However, it is clear from Commerce's explanation that it found that the GOC maintained *de facto* control over Win Faith because [ ]. *See* IDM at 14; BPI IDM at 3-4. While Commerce did not explicitly state that it considered the [ ] to be government controlled, its path of reasoning is clear, [ ], it follows that Commerce also finds that [ ] is government controlled. Thus, as Commerce stated, "government-controlled or owned organizations hold indirectly majority ownership shares in Win Faith." IDM at 14.

Indeed, the record is full of references to the fact that Win Faith's parent company, [ ] was controlled by the Chinese government:

- [

].

- [
  ].” *Id.* at Exhibit 3.

In other words, [ ] makes clear that it is a state-owned enterprise and even highlights this fact on numerous websites. *Id.* at Exhibits 1-6.

Consolidated Plaintiffs argue that “Commerce’s reasoning is muddled at best and conflates certain aspects” of its analysis of *de facto* government control with majority and minority ownership. Consol. Pls.’ Br. at 33.[5] However, Commerce’s explanations “do not have to be perfect,” *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009), and the court will “uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.” *Motor Vehicle Mfrs. Ass’n*, 463 U.S. 29 at 43. Here, Commerce’s path of reasoning may reasonably be discerned. Commerce unmistakenly explained that it was finding *de facto* government control over Win Faith under 19 C.F.R. § 351.108(b)(1)(i)(A) because Win Faith’s parent company was owned by “government-controlled or owned organizations.” Commerce further explained that Win Faith’s organization chart demonstrated that “two state-owned enterprises, *along with another GOC-controlled entity*, indirectly control Win Faith.” BPI IDM at 3. It is reasonably discernable

[5] Consolidated Plaintiffs’ argument appears to be predicated in part on the fact that Commerce also explained that the record showed that one of Win Faith’s directors held management positions in [ ], and faulted Commerce for not providing further analysis for rejecting separate rate eligibility based on this finding under 19 C.F.R. § 351.108(b)(1)(i)(B). *See* Consol. Pls.’ Br. at 34, *see also* BPI IDM at 4. However, Commerce made clear that its finding that Win Faith had not rebutted the presumption of government control based on the fact that Win Faith was majority-owned by a state-owned entity pursuant to 19 C.F.R. § 351.108(b)(1)(i)(A). Commerce merely noted that in addition to the fact that the GOC majority-owned Win Faith, the fact that Win Faith’s director also held management in other GOC-owned companies further supported its finding that the GOC exerted *de facto* control over Win Faith. However, as Commerce had already determined that Win Faith was majority-owned by the GOC, it had no reason to further analyze whether Win Faith’s directors had the ability to make or influence production, commercial and export decisions.

that this GOC-controlled entity refers to [

].

Given Commerce's unmistakable finding that Win Faith was ineligible for a separate rate because GOC-owned or -controlled entities had majority ownership of Win Faith, the court should sustain the agency's determination.

### C. **<u>Commerce's Certification Regime is Reasonable and Not an Abuse of Discretion</u>**

Finally, Consolidated Plaintiffs argue that Commerce's certification regime unlawfully prevents importers from proving to CBP that their merchandise is not circumventing the antidumping and countervailing duty orders on *Hardwood Plywood from China* without providing an exporter's certification. Consol. Pls.' Br. at 36-41. Specifically, Consolidated Plaintiffs aver that Commerce's liquidation instructions "prevent CBP from exercising its own inherent authority," *see id.* at 40, that is, Commerce's authority to request information from importers to correctly classify merchandise by requesting further information pursuant to CF28 Requests for Information, or by requesting samples of imported merchandise. *See id.* at 37-39. Consolidated Plaintiffs arguments misses the mark.

As an initial matter, in the case of merchandise that is subject to antidumping and countervailing duty orders, CBP's role in liquidating entries is "merely ministerial," *see Mitsubishi Electronics America, Inc. v. United States*, 44 F.3d 973, 977 (Fed. Cir. 1994) and "CBP lacks discretion when it liquidates entries pursuant to Commerce's liquidation instructions." *Rimco, Inc. v. United States*, 582 F. Supp. 3d 1313, 1320 (Ct. Int'l Trade 2022), *aff'd Rimco Inc. v. United States*, 98 F.4th 1046 (Fed. Cir. 2024). This is only logical—here, Commerce conducted lengthy and rigorous proceedings to determine whether exporters would be eligible to certify that their

merchandise was not circumventing the antidumping and countervailing duty orders on *Hardwood Plywood from China*. That is, Commerce already did what Consolidated Plaintiffs propose CBP be able to do—determine whether certain merchandise was not produced under any of the five scenarios found to be circumventing the orders. *See* Consol. Pls.' Br. at 36.

What Consolidated Plaintiffs propose is nothing more than getting a second bite at the apple. As Commerce recognized, allowing importers to submit documents to "prove" that imported merchandise "does not meet the definition of in-scope or circumventing merchandise" "would create loopholes in the certification program," and undermine Commerce's determinations as to whether foreign producers or exporters were eligible for the certification regime. IDM at 19. Commerce further explained that "allowing importers to supply second-hand information" from companies that had failed the certification process would be illogical given that Commerce had "no confidence that the information supplied by . . . these companies to their importers would be accurate or reliable." *Id.*

Consolidated Plaintiffs' appeal to this court's decisions in *Vanguard Trading Co. LLC v. United States*, 788 F. Supp. 3d 1277 (Ct. Int'l Trade 2025) and *Blue Pipe Steel Ctr. Co. v. United States*, 803 F. Supp. 3d 1258 (Ct. Int'l Trade 2025)—a pair of cases involving the Enforce and Protect Act ("EAPA")—are inapposite. As an initial matter, EAPA vests in CBP the authority to initiate and carry out investigations of whether merchandise is evading antidumping and countervailing duties—not Commerce, *see generally* 19 U.S.C. § 1517,[6] whereas the authority to conduct antidumping and countervailing duty proceedings—including circumvention proceedings—is entrusted entirely to Commerce. Indeed, as Consolidated Plaintiffs acknowledge,

[6] Indeed, the only authority granted to Commerce under EAPA is to determine whether the merchandise at issue is covered merchandise and, even then, only when CBP has referred the issue to Commerce. *See* 19 U.S.C. § 1517(b)(4)(A).

the court in those cases found that CBP "had its own inherent authorities under {EAPA} that were not governed by Commerce." Consol. Pls.' Br. at 40. As the court in *Blue Pipe Steel* recognized, CBP's authority under EAPA "is independent of Commerce's authority under the AD/CVD provisions of law." 803 F. Supp. 3d at 1263.

The opposite holds true as well. Commerce's authority to determine that merchandise is subject to antidumping and countervailing duty laws is squarely within its authority, and its authority alone, and is independent of CBP's authority to assess the proper classification of imports. Because CBP's role in carrying out Commerce's determination in antidumping and countervailing proceedings is "merely ministerial," Commerce did not impinge on CBP's authority by requiring both importer and exporter certifications.

## VII. CONCLUSION

For the foregoing reasons, we respectfully request that the court deny Plaintiffs' motions, sustain Commerce's *Final Determination*, and enter judgment for Defendant.

Respectfully submitted,

*/s/ Timothy C. Brightbill*

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: November 10, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor's Response to Plaintiffs' Motions for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,793 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition for Fair Trade in Hardwood Plywood
(Representative Of)

November 10, 2026
(Date)